1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NEWMAN JONES PLLC**
ATTORNEYS AT LAW
14747 N. NORTHSIGHT BLVD., STE 111-143
SCOTTSDALE, ARIZONA  85260
TELEPHONE (480) 686-7762

Christine N. Jones / 018425 / cjones@newmanjones.com
Alexandra V. Boles / 039387 / aboles@newmajones.com

*Attorneys for Plaintiff*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SHELBY MURPHY, D.O., | Case No.: _____ |
| Plaintiff, | **CIVIL COMPLAINT FOR BREACH OF WRITTEN EMPLOYMENT CONTRACT AND DAMAGES FOR WRONGFUL TERMINATION** |
| v. | |
| CREIGHTON UNIVERSITY, a Nebraska nonprofit corporation, | **Jury Trial Demanded** |
| Defendant. | |

**COMES NOW**, Plaintiff, Shelby Murphy, D.O. ("Plaintiff" or "Dr. Murphy"), by and through undersigned counsel, to bring this action against Defendant Creighton University, a Nebraska nonprofit corporation ("Defendant"). As detailed below, Defendant is in breach of a written employment contract with Plaintiff. Plaintiff will show this Honorable Court as follows:

### JURISDICTION AND VENUE

1.    This Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between a citizen of the State of Arizona and a citizen

of the State of Nebraska, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

3.    At all times material to this Complaint, Plaintiff Dr. Shelby Murphy was an adult resident of Maricopa County in the State of Arizona.

4.    At all times material to this Complaint, Defendant Creighton University ("Defendant"), is and was a Nebraska nonprofit corporation duly authorized to do business in the State of Arizona, which has conducted business throughout the State of Arizona on a systematic and continuous basis.

5.    Upon information and belief, at all times relevant to this Complaint, individuals — including but not limited to Joann Porter, MD, Keith Paley, MD, Daniel Castellanos, MD, Sai-Sridhar Boddupalli, MD, and Juliaette Chamberlain, as well as other doctors, physicians, hospitalists, residents, surgeons, nurses, nurse practitioners, physicians' assistants, nursing assistants, technicians, and other health care providers — were employees and/or agents and/or ostensible agents of Defendant who were duly empowered to make decisions regarding Plaintiff's employment with Defendant.

## FACTUAL ALLEGATIONS

6.    Dr. Murphy joined Defendant's Graduate Medical Education Program ("Program") on June 22, 2023, as a House Staff Physician ("HSP") Post-Graduate Year One

("PGY-1"), pursuant to her agreement to a written employment contract with Defendant Creighton University ("Contract"). *See* Exhibit A hereto.

7.    The Contract enumerated various typical employment provisions, including, but not limited to, Plaintiff's salary (*id.* at p. 2), conditions of promotion (*id.* at p. 2), workplace responsibilities (*id.* at p. 1), work environment and duty hours (*id.* at p. 3), vacation and sick leave policies (*id.* at p. 4), Family and Medical Leave Act of 1993 provisions (*id.* at p. 4), and Defendant's noncompete policy (*id.* at p. 5).

8.    It was Dr. Murphy's long-time goal to use her medical training to better the underserved population in the greater Phoenix area.

9.    After having accomplished more than twenty (20) years of requisite educational achievements, Dr. Murphy was thrilled to join Defendant's Program, especially because of its association and cooperation with Valleywise Health ("Valleywise"), a public hospital system.

10.    Dr. Murphy progressed well through the first several months in the Program, gaining exposure to different rotations and fulfilling various competencies.

11.    At the beginning of Dr. Murphy's service in the Program's general surgery practice, Dr. Justin Galvis ("Dr. Galvis"), a senior resident with authority over Dr. Murphy, gave Dr. Murphy blanket permission to electronically sign his name in the "witness" field of patient consent forms — even if he had not physically witnessed the patient's consent — so that she would not have to "disturb" him while he was in the midst of his other duties.

12. "Consenting" is used to describe the process by which patients are informed about the surgical procedure they are to undergo, and then give voluntary permission ("informed consent") to receive the described treatment.

13. Dr. Galvis' direction to electronically sign his name in the "witness" field of patient consent forms — even if he had not physically witnessed the patient's consent — was consistent with instructions Dr. Murphy had received from other senior residents, including Fellow Jessica Hale, DO; burn surgery service Chief Danielle Tanner, DO; Visiting Resident Devon Raja, MD; Fellow Tommy Tran, MD; night team burn surgery Chief William Schertzing, MD; Kyle Leong, DO; surgical intensive care unit Chief Mariah Janowski, DO; Christina Momchev, MD; acute care surgery service Chief Steven Marincel, MD; Louis Kalamchi, MD; Anthony Gianiorio, DO; and Cees Whisonant, MD.

14. Dr. Murphy had received no contrary instruction that documenting patient consents in this way was medico-legally improper.

15. On March 22, 2024, while serving in the general surgery service at Valleywise, Dr. Murphy was assigned to significantly more patients than typical, because other residents in her cohort were on vacation.

16. Through an unfortunate — but not unusual — confluence of events, Dr. Murphy was exposed to significant time pressure to consent a patient before appearing at "sign out," a mandatory end-of-shift meeting. As a result, Dr. Murphy administered her last patient's consent properly, but electronically signed Dr. Galvis's name in the witness field of the form — as she had been instructed to do.

17.  Less than an hour later, Dr. Murphy was called into the office of Nicole Jones, MSN-L, RN, CNOR (the Nurse Manager of Perioperative Services at Valleywise, "Nurse Jones").

18.  In Nurse Jones's office, Defendant's General Surgery Residency Program Director, Dr. Keith Paley ("Dr. Paley"), confronted Dr. Murphy about having signed Dr. Galvis's name to the consent form as a "witness."

19.  Taken aback, Dr. Murphy's first instinct was to say that Dr. Galvis had signed the form himself; however, upon further discussion, Dr. Murphy clarified that she had signed on Dr. Galvis's behalf.

20.  Again, Dr. Galvis had instructed Dr. Murphy to sign his name (even when he was not present) so that she would not interrupt his performance of other tasks.

21.  Dr. Paley verbally notified Dr. Murphy that she was placed on probation, effective immediately.

22.  Dr. Murphy started her next rotation, as previously scheduled, at Dignity Health St. Joseph's Hospital and Medical Center ("St. Joseph's"), on or about the next day, March 23, 2024.

23.  On or about March 27, 2024, Dr. Murphy was instructed to go home, and was notified that she was being put on paid administrative leave, effective immediately.

24.  On April 1, 2024, Dr. Murphy attended a meeting with Dr. Paley; Dr. Paley indicated he had spoken with Dr. Daniel Castellanos (Defendant's Associate Dean and Dr. Murphy's Designated Institutional Official, "Dr. Castellanos"), Dr. Anne Henderson, and

Juliaette Chamberlain (Defendant's Manager of Graduate Medical Education, "Ms. Chamberlain") about the events of March 22, 2024.

25.   At the April 1, 2024, meeting, Dr. Murphy was horrified to receive notice that she was dismissed from Defendant's Program, effective immediately, for "professional concerns."

26.   On or about April 5, 2024, Dr. Murphy submitted a letter to Dr. Castellanos, objecting to her dismissal and formally requesting an appeal.

27.   On or about April 11, 2024, Dr. Murphy met with Dr. Castellanos and Ms. Chamberlain in-person to attempt an informal resolution of the dismissal, to no effect.

28.   As a result, Dr. Murphy requested a formal *ad hoc* panel hearing on the issue of her dismissal.

29.   On or about April 23, 2024, Dr. Murphy received notice from Dr. Castellanos that she was invited to appear before an *ad hoc* panel for a hearing.

30.   Dr. Murphy gathered four (4) witnesses to testify on her behalf before the *ad hoc* panel, and compiled twelve (12) letters of support from various medical professionals, among other materials; on or about April 30, 2024, Dr. Murphy submitted these documents to the *ad hoc* panel for review, and awaited the hearing.

31.   On May 7, 2024, Dr. Murphy's witnesses appeared at the hearing and answered the panel's various questions — including questions posed by Defendant's Associate General Counsel, Andrea M. Jahn — regarding their experiences with the consent process and the broader context of expectations surrounding a resident's performance.

32.  Each of Dr. Murphy's witnesses described having been directed to put the names of absent, more senior staff in the "witness" section of consent forms. One physician confirmed observing the practice on a weekly basis — at minimum — throughout the previous six (6) years he had been working at Valleywise.

33.  However, when asked, Dr. Paley refused to acknowledge that the March 22, 2024, incident involving Dr. Murphy had constituted a "sentinel event" — an adverse event that occurs as a symptom of a much larger, program-wide issue.

34.  Still, by the end of the hearing, Dr. Murphy was hopeful that the panel would understand her signing Dr. Galvis's name to the consent had not only been excusable, but had been the direct result of a lack of proper training from Defendant on the matter — not a lack of her own character or integrity.

35.  Yet, on May 9, 2024 — just two days after the *ad hoc* panel hearing — Dr. Sai-Sridhar Boddupalli (one of Defendant's associate professors) released a Confidential Memorandum ("Memorandum") which endorsed Dr. Murphy's dismissal.

36.  The Memorandum specifically detailed that a lack of education on properly recording a consent had been expressed by multiple individuals testifying on Dr. Murphy's behalf, and affirmatively recommended that the "consent process be more explicitly covered by the General Surgery program during orientation and periodically during the academic year for better understanding of this important medico-legal document," especially "[g]iven that this [was] a recurring concern expressed by multiple individuals…."

37. Dr. Murphy was devastated. In an act of desperation, Dr. Murphy sent Dr. Castellanos a final statement on or about May 16, 2024, where she shouldered fault for her actions and begged that he at least allow her to resign from her position.

38. On May 20, 2024, Dr. Castellanos upheld Dr. Murphy's dismissal for the final time, and did not allow her to resign.

39. Pursuant to the Contract between Dr. Murphy and Defendant, Defendant had an affirmative obligation to "use its reasonable efforts to meet or exceed the guidelines related to house staff education as set forth in the 'Policies and Procedures' established by the ACGME." *See* Exhibit A, p. 2 (Art. I, "Responsibilities of the University") (emphasis added).

40. Upon information and belief, Defendant often publishes its own Graduate Medical Education ("GME") policies, which elaborate on policies set by the ACGME — the Accreditation Council for Graduate Medical Education. Many of Defendant's GME policies explicitly specify that in the event of any discrepancies between an ACGME policy and a GME policy, the Defendant's GME policy governs.

41. In return, Dr. Murphy contractually agreed to "comply with the bylaws, rules, regulations, policies, procedures, and protocols of the clinical affiliate site and its medical staff (collectively "Training Site Rules") of any site at which [she] receive[d] Program training." *Id.,* pp. 1-2 (Art. I, "Responsibilities of HSP").

42. Dr. Murphy further agreed she "should refer to [] designated references for further clarification of policies and procedures" and was instructed that "where policies for HSPs differ[ed] from those listed in the regular Staff Handbook, they [would be] specifically

8

listed in GME policies, program policies or in [the Contract] and [would] take precedence over those listed in the University Staff Handbook." *Id.*, p. 2.

43.   The ACGME specifies that, "Programs, in partnership with their Sponsoring Institutions, *must* educate residents and faculty members concerning the professional and ethical responsibilities of physicians . . ." *See* Exhibit B, p. 38 (ACGME Common Program Requirements (Residency), Section VI.B.1) (emphasis added).

44.   However, Dr. Murphy was *never* made aware of — or given access to — any written bylaws, rules, regulations, policies, procedures, or protocols for how to properly document a patient's "consent."

45.   Upon information and belief, there was *no* ACGME or GME policy during Dr. Murphy's time in Defendant's Program which discussed how to properly fill out a "consent" form for a patient.

46.   Upon information and belief, as separate and distinct medical facilities, Valleywise and St. Joseph's would have maintained different processes for filling out patient "consent" forms, resulting in no authoritative guidance as to how to "properly" document a consent.

47.   Lacking any written policy or other formal instruction on the matter, Dr. Murphy reasonably relied upon, and followed, the instructions of her immediate superiors in filling out the consent forms.

48.   While Dr. Murphy went above and beyond to ensure that patients were informed about any procedures they expected to undergo and provided their informed

consent to such procedures, even Arizona statutory regulations do not describe the presence of a witness being required for effective consent. *See* A.R.S. § 36-551(17).

49.    The only "training" Dr. Murphy received as to how to technically perform a consent, then, came from other residents — including, here, from Dr. Galvis.

50.    Dr. Murphy was never instructed — nor was any such admonition outlined on the actual consent form — that a witness was required to have seen the patient sign their name, or that the witness should be from a different team, or that any issue with the witness portion of the form might void the entire consent. Dr. Murphy's understanding was that, in giving her actual authority to sign their name as witness, a more senior staff member was endorsing her ability to properly obtain informed consent.

51.    As Elizabeth M.N. Ferguson, M.D., FACS ("Dr. Ferguson") (Creighton's prior General Surgery Residency's Program Director) detailed in a letter supporting Dr. Murphy at the time of her appeal:

> "Previously, there was formal education provided to every surgical trainee regarding informed consent in the first months of their training . . . For something this important to patient care, the program has a responsibility to ensure this education is comprehensive. To my knowledge, this education has been absent in the program curriculum since I left leadership in 2018. Six years later, informed consent is something residents are just supposed to 'pick up' from other residents or attendings." *See* Exhibit C (April 30, 2024, Letter from Dr. Ferguson).

52.    Indeed, providing proper training as to appropriate professional and ethical responsibilities for Dr. Murphy remained the ultimate contractual responsibility of the Defendant, not Dr. Murphy:

a.  This is acknowledged throughout Defendant's GME policies, including their Supervision policy:

    i.  "The responsibility of supervising faculty is to enhance the knowledge of HSPs while ensuring patient safety and quality care. Such responsibility is exercised by observation, consultation, and feedback, and includes the imparting of knowledge, skills, and attitudes/behaviors to the HSPs and the assurance that care is delivered in an appropriate, timely, and effective manner." *See* Exhibit D, p. 2 (August 7, 2023, Supervision Policy).

    ii.  "Supervising faculty are ultimately responsible for the care provided to each patient and they must be familiar with each patient for whom they are responsible. Fulfillment of that responsibility requires personal involvement with each patient and each HSP who is participating in the care of that patient. . . . Supervising faculty members should appropriately delegate portions of care to HSPs, based on the needs of the patient, the skills of the HSPs and other regulatory requirements . . ." *Id.*

    iii.  "Each program is responsible for training their supervising faculty in their roles and responsibilities." *Id.*

53.  In sum, it was — at all times and in all manners — Defendant's contractual obligation to (1) instruct Dr. Murphy to perform and document consents properly and (2)

directly supervise Dr. Murphy as she conducted and documented consents until she demonstrated the requisite competency to do so without direct supervision.

54.   In both of the aforementioned aspects, Defendant abjectly failed Dr. Murphy, and therefore breached the Contract between them.

55.   Then, Defendant egregiously terminated Dr. Murphy's employment for her failure to properly engage in hospital-specific procedures which she was never adequately instructed how to perform.

## COUNT ONE
### Breach of Written Employment Contract & Damages for Wrongful Termination

56.   Plaintiff hereby incorporates the foregoing paragraphs by reference.

57.   Defendant is called to answer Count One.

58.   Any plaintiff with a breach of contract claim must prove the existence of a contract, a breach of that contract, and resulting damages. *Thunderbird Metallurgical, Inc. v. Arizona Testing Laboratories*, 5 Ariz. Appp 48, 50 (1967); *see also Rogus v. Lords*, 166 Ariz. 600, 135 (1991) (a contract exists where there is an offer, acceptance, consideration, and "sufficient specification of terms to that the obligations involved can be ascertained"; manifestation of mutual assent is tantamount).

59.   The Contract in the present matter constitutes an enforceable contract between Plaintiff and the Defendant:

   a.   The Contract evidences Defendant's offer of employment to Plaintiff.

   b.   The Contract evidences Plaintiff's acceptance of Defendant's offer.

     c.  The mutual consideration underlying the Contract included Plaintiff's services as a House Staff Physician in exchange for a salary of "$61,527.00 per annum payable in equal monthly amounts." *See* Exh. A at p. 2.

     a.  The terms of the Contract were specific, and there can be no doubt as to the Parties' mutual assent and intent to be bound.

60.  Defendant breached the written employment Contract they entered with Plaintiff — and currently remain in breach — both by failing to adequately educate Dr. Murphy in accordance with the terms of the Contract, and by subsequently terminating her employment under the Contract as a result of its own failures.

61.  Dr. Murphy's termination from the Program on April 1, 2024, was wrongful and is brought before this Honorable Court timely. *See* A.R.S. § 12-541(3)-(4).

62.  As a direct and proximate result of the aforementioned breach and wrongful termination, Plaintiff has suffered damages since April 1, 2024; specifically, Defendant's breach has deprived Plaintiff of the benefits explicitly contemplated to flow to her under terms of the Contract.

63.  Additionally, Plaintiff has suffered consequential damages, including significant damage to her personal reputation and prospects in the medical field after roughly two decades of education. Plaintiff was just shy of being eligible to apply for full licensure as a physician at the time of her termination (Arizona requires completion of at least twelve (12) months in residency to become eligible). To date, despite significant efforts to do so, Plaintiff has been unable to secure placement in another residency program.

64.     Plaintiff has also had to expend extensive financial resources to seek enforcement of the Contract; Plaintiff is entitled to an award of reasonable attorney fees and costs incurred in pursuing the present action. A.R.S. § 12-341, *et seq.*; A.R.S. § 12-341.01.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court cause service to issue upon the Defendant and that this matter be set for trial before a jury.

Upon a jury trial thereon, Plaintiff prays the following relief be granted: (i) judgment against the Defendant in an amount to be determined at trial, (ii) reasonable attorney fees and other costs incurred in pursuing the present action, and (iii) any further relief this Honorable Court may deem just and proper.

**DATED** this, the 20th day of March, 2025.

**NEWMAN JONES PLLC**

By     */s/ Christine N. Jones*
Christine N. Jones, Esq.
Alexandra V. Boles, Esq.
14747 N. Northsight Blvd., Ste 111-143
Scottsdale, AZ  85260
(480) 686-7762
cjones@newmanjones.com
aboles@newmanjones.com

*Attorneys for Plaintiff*

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2025, I caused the foregoing document to be filed with the Court via CM/ECF.


*/s/ Alexandra V. Boles*
Alexandra V. Boles, Esq.

# EXHIBIT A



**GRADUATE MEDICAL EDUCATION PROGRAM AGREEMENT**
**2023-2024**
**Phoenix**

**THIS AGREEMENT,** entered into on 06/22/2023, "Agreement" by and between CREIGHTON UNIVERSITY (hereinafter referred to as the "University"), and Shelby Murphy, DO (hereinafter referred to as the "HSP" [House Staff Physician]).

**WITNESSETH:**

**WHEREAS**   University has developed a Graduate Medical Education Program in Phoenix, Arizona and has entered into affiliation arrangements with different hospitals in connection with the implementation of that Program; and

**WHEREAS**   HSP desires to pursue graduate medical education or post graduate medical education within the Program in accordance with the provisions of this Agreement.

**NOW THEREFORE,** the parties agree as follows:

**ARTICLE I**

**Acceptance.** HSP will enroll in University's School of Medicine as a candidate for certification in CUPHX - General Surgery and the University accepts this application to also enroll HSP in the designated specialty postgraduate training program, subject to the appointment of HSP to the staff of the affiliated hospitals designated by the University.

**Disclosure/Licensure.**
**A.** HSP agrees to obtain and maintain an appropriate Arizona license or permit to practice medicine. HSP's failure to obtain a post graduate training permit (PGTP) or a permanent license from Arizona by the starting date of the Term (as defined below) constitutes grounds for the Program to revoke HSP's acceptance into the Program and renders this Agreement null and void.
**B.** In the event HSP obtains a permanent Arizona license during the Term of this Agreement, HSP must provide a copy to the GME office within five business days of issuance.
**C.** HSP's failure to provide documentation of and maintain appropriate Arizona medical licensure during the Term of this Agreement will constitute grounds for the University to immediately terminate this Agreement.
**D.** If HSP is issued a temporary educational permit or a permanent Arizona medical license which is provisional, probationary or restricted (all referred to as a "Provisional License"), either at or before the commencement of the Term, or at any time during the Term, HSP has an obligation to immediately (within 24 hours) notify the Program Director and the Designated Institutional Official ("DIO") of such fact. If HSP with a Provisional License, HSP shall be automatically considered to be on "under review" status for the entire period HSP has a provisional license.   There are no rights to grieve or appeal the "licensure under review" status imposed under this section.  In addition, HSP must also promptly (within 24 hours) notify by electronic mail the Program Director and the DIO any time HSP is notified by the State of Arizona any possible violation of the terms of the Provisional License, or any action HSP is being asked to take (testing, attending a hearing, etc.).
**E.** Failure to meet University and affiliated hospital immunization and health standards and pass University and affiliated hospital criminal background check(s) and/or drug screening processes will constitute grounds for the Program to terminate HSP's position in the Program. Immunization and health standards of University and the affiliated hospitals are subject to update from time to time.  What constitutes a passing criminal background check is at the discretion of University and the affiliated hospitals.
**F.** HSP's failure to do any of the actions listed in this section shall result in immediate termination of this Agreement.
**G.** Special Rules for Phoenix Child Psychiatry HSPs and Phoenix Emergency Medicine Ultrasound HSPs:  Phoenix Child Psychiatry HSPs and Emergency Medicine Ultrasound HSPs must present to their Program Director and GME Office a valid unrestricted Arizona license to practice medicine no later than ninety (90) days after the first day of the Term.  If a valid unrestricted Arizona license to practice medicine is not presented before this deadline, this Agreement will automatically terminate and become null and void.

**Responsibilities of HSP.** HSP agrees to participate fully in the educational activities of the Program including the teaching and supervision of other house staff physicians and medical students, to participate in patient care activities, orientation, committees, councils, and institutional programs, and to adhere to established practices, procedures, and policies of the University.  HSP will strive to develop a personal program of self-education and professional growth under the guidance of the teaching staff. HSP agrees to fully comply with and demonstrate appropriate levels of the general competencies and milestones as outlined by the Accreditation Council for Graduate Medical Education ("ACGME"), American Board of Medical Specialties ("ABMS"), and any other applicable professional educational accrediting body.   The terms and conditions set

forth in this Agreement are subject to reasonable rules established by the accrediting bodies for each training program. HSP shall comply with all University rules, policies, procedures and protocols. HSP shall comply with the bylaws, rules, regulations, policies, procedures, and protocols of the clinical affiliate site and its medical staff (collectively "Training Site Rules") of any site at which HSP receives Program training. Subject to GME policy and direction of the DIO, HSP shall cooperate with the utilization management, quality assurance, risk management, peer review and human resource departments or programs of any training site at which HSP receives Program training. In addition to this Agreement, HSP should refer to the designated references for further clarification of policies and procedures. Because HSPs are trainees of the University, some Staff policies are not appropriate for HSPs. Where policies for HSPs differ from those listed in the regular Staff Handbook, they are specifically listed in GME policies, program policies or in this Agreement and take precedence over those listed in the University Staff Handbook. HSP is not faculty or a student and so the Faculty Handbook and Student Handbook are not applicable to HSP. HSP shall not have any authority to enter into any commitment or agreement of any kind on behalf of the University or any affiliated hospital.

**Responsibilities of the University**. The University agrees to use its reasonable efforts to meet or exceed the guidelines related to house staff education as set forth in the "Policies and Procedures " established by the ACGME. The terms and conditions set forth in this Agreement are subject to reasonable rules established by the accrediting bodies for each training program.

**Salary.** For HSP's services and in support of HSP's training, University will provide HSP at the Post Graduate Year of 1 with a salary based on their level of training in their current program in the amount of $61,527.00 per annum payable in equal monthly amounts. **If the initial Term is less than or exceeds twelve months, University will pay a pro rata portion of HSP's salary for the time period June 22, 2023 through June 30, 2024.**


## ARTICLE II

**Appointment and Advancement.** Conditions for reappointment and promotion to a subsequent PGY level can be found in the policy link below. HSP accepts enrollment in the Program from 06/22/2023 to 06/30/2024 (the "Term") and agrees to fulfill the educational requirements of the Program during the entire Term. Enrollment in the Program shall qualify HSP as a trainee at University. The parties anticipate that this Agreement or a renewal Agreement shall be entered into each year for the duration of the Program unless terminated or not renewed by the University. For provisions regarding advancement and termination of Agreement see institutional and program policies. University's GME policies can be found at https://medschool.creighton.edu/residencies-fellowships/residencies-fellowships-omaha/graduate-medical-education-office/policies. The Institutional Advancement policy is located on the provided link, under the Institutional Policies header and is labeled as "Appointment, Promotion, Renewal, and Dismissal Policy".

This Agreement may be terminated for the reasons set out in the Corrective Action Policy. This Agreement may be non-renewed as set forth in the Appointment, Promotion, Renewal, and Dismissal Policy. If HSP is in jeopardy of non-promotion, HSP should refer to the Institutional Appointment, Promotion, Renewal, and Dismissal Policy.

**Notice By HSP of Intent to Non-Renew; Liquidated Damages.** In the event HSP decides HSP will not continue in the Program following the end of any Term HSP must notify the Program Director four months prior to the end of the Term of their intention to leave the Program after completing the Term (the "Notice"). HSP's failure to give proper notice will cause the Program to suffer damages that will be difficult to ascertain with certainty. For that reason, the parties agree as follows: if HSP fails to give proper Notice, HSP will owe University, as liquidated damages, and not as a penalty, a sum of money equal to $10,000 (the "Liquidated Damages"). The parties agree that the Liquidated Damages represent a reasonable estimate of the damages the Program will suffer as a result of HSP's failure to give proper Notice. HSP agrees that University will withhold the final paycheck which would otherwise be payable to HSP if HSP fails to give the proper Notice. In addition, HSP will pay University any remaining owed Liquidated Damages no later than the last day of the Term, if University does not withhold the entire amount owed from HSP's final paycheck for whatever reason. In the event there are extenuating circumstances which result in HSP's failure to give proper notice, HSP will have the right to take the matter to the DIO within ten business days of being informed of the imposition of the Liquidated Damages and request a waiver or reduction of the Liquidated Damages. The DIO will review the matter and decide on the requested waiver. Their decision is final. If University advises HSP that it will not renew this Agreement, or if HSP is terminated for cause under the Corrective Action policy, HSP will not owe any Liquidated Damages.

**Mid-Cycle Breach; Liquidated Damages.** As noted above, this Agreement is for a specified Term. In the event HSP (a) decides to leave the Program before the end of the Term or (b) has failed to report for duty for three days (whether or not these unexcused absences occur on consecutive days) or (c) leaves a scheduled shift three times without obtaining Program Director approval (whether or not on consecutive days) or (d) has combined total of three events described under (b) or (c), HSP will be considered to have breached this Agreement. (Note: a mid-cycle transfer to a different program within Creighton University is also considered to be a breach of this agreement.). In the event HSP breaches this Agreement, the University will suffer damages that will be difficult to ascertain with certainty. For that reason, the parties

agree as follows: if HSP breaches the Agreement, for any of the reasons set out in this section, HSP will owe the University, as liquidated damages, and not as a penalty, a sum of money equal to $10,000 (the "Liquidated Damages"). The parties agree that the Liquidated Damages represent a reasonable estimate of the damages the University will suffer as a result of HSP's breach of the agreement and mid-cycle departure. HSP agrees that the University will withhold the final paycheck which would otherwise be payable to HSP, upon learning of HSP's breach and HSP will pay the University the remainder of the Liquidated Damages within thirty (30) days after HSP's departure from the Program.

In the event there are extenuating circumstances which necessitate HSP's mid-cycle departure, HSP will have the right to take the matter before the DIO.  The DIO will determine if the situation is enough of a hardship that justifies a waiver of the Liquidated Damages.  The DIO's decision is final.

**Survival.** This Article II shall survive termination of this Agreement.

**ARTICLE III**

**Examination Requirements for Advancement**.  The following paragraphs represent the examination requirements HSP must meet in order to advance in the Program:

HSP must take Step 3 of the USMLE or COMLEX Exams or Part II of the Licentiate of the Medical Council of Canada Qualifying Exam (LMCC) or their equivalent (as recognized by the Arizona Regulations and Licensure Agency) by December 31st of their PGY 2 year. If HSP has not taken the test by December 31st of their PGY 2 year, HSP will be treated as having failed the test and will be dismissed from the program on June 30th of their PGY 2 year.  There will be no right to grieve or to appeal this dismissal.

HSP  must provide proof of passing USMLE Step 3 or its equivalent by May 31st of their PGY 2 year. If HSP fails to provide proof of passing USMLE Step 3 or its equivalent (as recognized by the Arizona Regulations and Licensure Agency) to the GME office *May 31st of the PGY 2 year,* HSP will be dismissed from the program on June 30th of their PGY 2 year. There will be no right to grieve or to appeal this dismissal.

If HSP been terminated due to not passing USMLE Step 3 or its equivalent (as recognized by the Arizona Regulations and Licensure Agency), HSP may reapply to their program after passing Step 3 as an outside applicant. HSP must follow all processes outlined by the NRMP and this Article III. Once HSP passes USMLE Step 3 or its equivalent (as recognized by the Arizona Regulations and Licensure Agency), it will be up to the program's Clinical Competency Committee if HSP is accepted back to the program. The CCC will decide whether HSP enters the program as a PGY 2 or a PGY 3.  In exceptional circumstances, HSP may request a hardship exception from the DIO; the DIO shall have full discretion whether to grant an exception and for how long.  There is no right to grieve or to appeal the termination, the CCC's decisions or the DIO's decision.

**ARTICLE IV**

**Work Environment and Duty Hours.**   The policy on Work Environment and Duty Hours is provided at https://www.creighton.edu/arizona-health/residencies-fellowships/graduate-medical-education-office/policies-and-procedures , and can be found under the Institutional Policies header, and is labeled as Graduate Medical Education Clinical and Education Work Hours Policy - Phoenix.

**ARTICLE V**

**Vacation.**  The University will provide HSP with twenty working days of vacation time, such vacations to be taken at a time acceptable to the Program Director.  Vacation for HSPs who are employed for less than one academic year will be prorated for that academic year. The maximum accrual amount is the twenty days awarded and any unused vacation will not be carried over to the following year.   HSPs will not be reimbursed for unused vacation time upon termination of employment. HSP is not eligible for holidays or holiday pay under University policy. If the term of this Agreement is less than twelve months, vacation days will be pro rated.

**ARTICLE VI**

**Sick Leave.**  The University, through agreements with the affiliated hospitals, will ensure that the salary provided herein will be continued to be paid during any period of illness up to a maximum of ten working days per year. HSP does not accumulate leave from year to year and no additional compensation will be paid for unused sick leave. If the term of this Agreement is less than twelve months, sick leave will be pro-rated.

## ARTICLE VII

**Dental, Health, Life and Disability Insurance.**  The University will provide HSP with group dental, health, life and disability insurance coverage.  Benefit information provided separately through the Human Resources Department.  HSP is subject to Human Resources coverage changes and participation guidelines as stipulated by the University Human Resources.

## ARTICLE VIII

**Counseling, Medical, Psychological Support.**  Counseling, Medical, and Psychological support assistance is available through the Medical benefits provided through the House Staff Health Insurance and through the Employee Assistance Program.

## ARTICLE IX

**Professional Liability Insurance.**  The University will provide professional liability insurance in the form, covering such perils and with such limits as are provided for on, or determined in accordance with the provisions of, Exhibit "A," which is attached and made a part of this Agreement.  The University agrees that no material changes in the professional liability insurance will be accomplished by action of the University, which will have an effect of eliminating or reducing the liability protection of HSP **for events occurring as part of the postgraduate training program and moonlighting in the State of Arizona** during the term of his/her enrollment in the Graduate Medical Education Program.

**Cooperation**. HSP agrees to cooperate in the defense of lawsuits or any other legal or quasi-legal action. Cooperation may include, but not be limited to, participating in depositions, interpreting medical records, meeting with University legal counsel, or other representatives of University.

**Survival**.  The provisions of this Article IX shall survive termination of this Agreement for a period of five (5) years, and therefore HSP agrees comply with this Article IX for a period of five (5) years after this Agreement terminates for any reason. Failure to cooperate may serve as a basis for University to assert a reservation of rights against HSP.

## ARTICLE X

**Harassment.**  Please see University Policies at http://www.creighton.edu/generalcounsel/cupolicies/ (2.1.25 and 2.1.35) and http://www.creighton.edu/generalcounsel/officeofequityandinclusion/.

## ARTICLE XI

**Impaired Physicians and Substance Abuse.**  The policy on Physician Impairment and Drug Testing is provided at https://www.creighton.edu/medicine/residencies-fellowships/residencies-fellowships-omaha/graduate-medical-education-office/policies , and can be found under the Institutional Policies header, and is labeled as Physician Impairment and Drug Testing Policy.

## ARTICLE XII

**Parental Leave Benefits.** Please see University Policies at    http://www.creighton.edu/generalcounsel/cupolicies/.   The policy can be found under the Human Resources header and is labeled as Parental Leave (2.2.26).

## ARTICLE XIII

**Medical, Parental, and Caregiver (MPC) Leave.**
HSP will be eligible for up to six (6) weeks of paid MPC leave for qualifying reasons that are consistent with FMLA (regardless of eligibility under federal law for FMLA leave), at least once during the HSP's time in the Program, starting the first day HSP reports to work in the Program. HSP's six (6) weeks of MPC leave is available in addition to vacation and sick leave. Vacation and sick leave may be used prior to or after MPC leave in a contract year. HSP may not use MPC leave in the same year the HSP uses parental leave.
This MPC leave benefit is only available once to HSP during their time in the Program. Should HSP complete this Program and continue to another Program sponsored by Creighton, HSP will again be eligible for MPC leave. All FMLA and other protected unpaid time may still be available to HSP for leave.

## ARTICLE XIV

**Leave of Absence and the Effect of Leave for Satisfying the Completion of the Program.**  HSP must comply with the policy on Leave of Absence and the impact on fulfilling requirements for specialty or subspecialty certification and board eligibility are provided at https://medschool.creighton.edu/residencies-fellowships/residencies-fellowships-omaha/graduate-

medical-education-office/policies. The policy can be found under the Institutional Policies header and is labeled as Graduate Medical Education Institutional Leave Policy. See also Program standard operating procedures.

## ARTICLE XV

**Bereavement Leave Benefits.** HSP may receive up to three working paid leave for attending the funeral of an immediate family member. Members of the immediate family are defined as father, mother, spouse, son, daughter, brother, sister, grandparents, grandchildren or in-laws of the same degree.

## ARTICLE XVI

**On-Call Rooms.** The University, through agreement with the affiliated hospitals, will ensure that HSP is provided with appropriate on-call room facilities.

## ARTICLE XVII

**Laboratory Coats and Laundering of Laboratory Coats.** Two laboratory coats are provided at the beginning of residency training. Replacement is provided by the GME Office. Laundering is the responsibility of HSP.

## ARTICLE XVIII

**Committees and Councils.** HSP agrees to participate in University and Hospital committees and councils to which they are appointed or invited.

## ARTICLE XIX

**Professional Activities Outside of Training Program.** The policy on professional activities outside of the training program is addressed as "Moonlighting" is provided at https://www.creighton.edu/medicine/residencies-fellowships/residencies-fellowships-omaha/graduate-medical-education-office/policies. The policy can be found under the Institutional Policies header and is labeled as Graduate Medical Education Moonlighting and Volunteering Policy – Phoenix.

## ARTICLE XX

**Corrective Action Policy.** The corrective action policy is addressed at https://www.creighton.edu/medicine/residencies-fellowships/residencies-fellowships-omaha/graduate-medical-education-office/policies. The policy can be found under the Institutional Policies header and is labeled as Corrective Action Policy.

## ARTICLE XXI

**Grievance Procedures.** The grievance procedure is addressed is provided at https://www.creighton.edu/medicine/residencies-fellowships/residencies-fellowships-omaha/graduate-medical-education-office/policies. The policy can be found under the Institutional Policies header and is labeled as Resident Due Process and Grievance Policy.

## ARTICLE XXII

**Program Reduction or Closure.** The policy regarding program reduction or closure is addressed at https://www.creighton.edu/medicine/residencies-fellowships/residencies-fellowships-omaha/graduate-medical-education-office/policies. The policy can be found under the Institutional Policies header and is labeled as Program Closure and Reduction Policy.

## ARTICLE XXIII

**Non-Compete Policy.** Creighton University has no restrictive covenants relative to practice or employment of HSPs after completion of postgraduate training https://www.creighton.edu/medicine/residencies-fellowships/residencies-fellowships-omaha/graduate-medical-education-office/policies. The policy can be found under the Institutional Policies header and is labeled as Non-Compete Policy.

## ARTICLE XXIV

**Accommodations for Disabilities.** The University's policy is to provide equal employment and educational opportunities to qualified HSPs with disabilities. For more information or to request reasonable accommodations, contact Human Resources.

## ARTICLE XXV

**Photograph Consent/Release. HSP** hereby consents and authorizes the University and any training site to which HSP is assigned to take photographs of HSP, and authorizes Creighton and such training site to use, reuse, copy, publish, display, exhibit, reproduce, and distribute said photograph in any educational or promotional materials or other forms of media, which may include, but are not limited to University or affiliate training site publications, catalogs, articles, magazines, recruiting brochures, websites or publications, electronic or otherwise, without notifying HSP.

University has applied for separate ACGME accreditation for its Phoenix residency and fellowship programs. In the event University is granted separate accreditation which becomes effective for this contract year, University will notify HSP and provide access to policies applicable to the Phoenix residency and fellowship programs.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement the day and year above written.
**CREIGHTON UNIVERSITY**

*Joann Porter*

**Joann Porter, M.D.**                                              **House Staff Physician (HSP)**
**Associate Dean for Graduate Medical Education**
**and Designated Institutional Official**



**SCHOOL OF MEDICINE**
**GRADUATE MEDICAL EDUCATION**

### EXHIBIT A
### 2023-2024
### PROFESSIONAL LIABILITY INSURANCE

The Medical School provides Professional Liability Insurance for all full-time House Staff Physicians.  The insurance carrier for HSPs in Arizona is Mutual Insurance Company of Arizona (MICA).

Coverage is on a "claims-made" basis subject to the terms and conditions of the MICA policy, with ***$1,000,000 per occurrence --- $3,000,000 aggregate*** limits of liability. The limit of liability applies separately to each House Staff Physician. Coverage is currently effective from 07/01/2023 through 06/30/2024 for the 2023-2024 academic year.  Coverage includes legal defense and protection against awards during their program and after the completion of a program if it was within the scope of their training.

The policy affords coverage for moonlighting **in the State of Arizona at designated internal sites only. Internal sites are defined as Arizona Health Education Alliance member sites operated by Valleywise Health and Dignity Health-St. Joseph's Hospital and Medical Center. The house staff physician is responsible for obtaining his/her own liability coverage for moonlighting performed outside the State of Arizona and at external sites within the State of Arizona. External sites are defined as sites outside the Arizona Health Education Alliance member sites.**  The house staff physician may contact the Liability Carrier utilized by the University to obtain an individual policy for moonlighting performed outside the State of Arizona and at external sites in the State of Arizona.  The Senior Manager for Graduate Medical Education must be notified of all moonlighting activities that the House Staff Physician engages in.  ***A Moonlighting Activity Report** must to be completed for all moonlighting activities.  Moonlighting Activity Reports are available through the program educational coordinator.*

All incidents, despite how minor, should be reported to Creighton's Risk Manager by phone to (402) 280-5833.  The Risk Manager will notify the insurance carrier.

The policy includes an Extended Reporting Period (tail coverage) for incidents occurring during the term of the Program but reported to MICA after its completion., There is no need for  HSPs to purchase an Extended Reporting Period Endorsement (tail coverage) at the conclusion of the Program

MICA arranges the entire plan. Creighton University campus contact is: Creighton University, Attention Katie Booton, Risk Manager, 2500 California Plaza, Linn Building, Room 123, (402) 280-5833, kbooton@creighton.edu.

My signature below indicates that I have read and understand the above information regarding the Malpractice Insurance and notification of Moonlighting Activity Report.


Shelby  Murphy, DO
**House Staff Physician (print name)**


**House Staff Physician (signature)**

# Signature Certificate

Reference number: GJSGU-4MU6U-G73QJ-TCNPL

| Signer | Timestamp | Signature |
|---|---|---|
| **Shelby Murphy**<br>Email: smurphy14@midwestern.edu | | |
| Sent:<br>Viewed:<br>Signed: | 26 Apr 2023 16:59:41 UTC<br>26 Apr 2023 16:59:45 UTC<br>26 Apr 2023 17:01:02 UTC | |
| **Recipient Verification:**<br>✔ Email verified | 26 Apr 2023 16:59:45 UTC | IP address: 72.195.237.91<br>Location: Phoenix, United States |
| **Joann Porter**<br>Email: joannporter@creighton.edu | | |
| Sent:<br>Viewed:<br>Signed: | 26 Apr 2023 16:59:41 UTC<br>28 Apr 2023 13:48:44 UTC<br>28 Apr 2023 13:48:53 UTC | |
| **Recipient Verification:**<br>✔ Email verified | 28 Apr 2023 13:48:44 UTC | IP address: 147.134.49.108<br>Location: Omaha, United States |

Document completed by all parties on:
28 Apr 2023 13:48:53 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 40,000+ companies worldwide.



# EXHIBIT B

# ACGME
# Common Program Requirements (Residency)

| Revision Information |
| --- |
| ACGME-approved interim revision: September 17, 2022; effective July 1, 2023 |

| **Definitions** |
| --- |
| For more information, see the [ACGME Glossary of Terms](). |
| Core Requirements: Statements that define structure, resource, or process elements essential to every graduate medical educational program. |
| Detail Requirements: Statements that describe a specific structure, resource, or process, for achieving compliance with a Core Requirement. Programs and sponsoring institutions in substantial compliance with the Outcome Requirements may utilize alternative or innovative approaches to meet Core Requirements. |
| Outcome Requirements: Statements that specify expected measurable or observable attributes (knowledge, abilities, skills, or attitudes) of residents or fellows at key stages of their graduate medical education. |
| **Osteopathic Recognition** |
| For programs with or applying for Osteopathic Recognition, the Osteopathic Recognition Requirements also apply (www.acgme.org/OsteopathicRecognition). |

## Common Program Requirements (Residency) Contents

Introduction ...................................................................................................................3
Int.A.      Definition of Graduate Medical Education ........................................3
Int.B.      Definition of Specialty ........................................................................3
Int.C.      Length of Educational Program ........................................................3
I.      Oversight ................................................................................................4
I.A.        Sponsoring Institution .......................................................................4
I.B.        Participating Sites ...............................................................................4
I.C.        Workforce Recruitment and Retention .............................................5
I.D.        Resources ...........................................................................................5
I.E.        Other Learners and Health Care Personnel......................................6
II.     Personnel ...............................................................................................7
II.A.       Program Director ................................................................................7
II.B.       Faculty ...............................................................................................12
II.C.       Program Coordinator........................................................................15
II.D.       Other Program Personnel ................................................................16
III.    Resident Appointments .......................................................................17
III.A.      Eligibility Requirements ...................................................................17
III.B.      Resident Complement ......................................................................18
III.C.      Resident Transfers ...........................................................................18
IV.     Educational Program...........................................................................19
IV.A.       Educational Components .................................................................19
IV.B.       ACGME Competencies .....................................................................20
IV.C.       Curriculum Organization and Resident Experiences ....................24
IV.D.       Scholarship .......................................................................................24
V.      Evaluation............................................................................................26
V.A.        Resident Evaluation .........................................................................26
V.B.        Faculty Evaluation ............................................................................30
V.C.        Program Evaluation and Improvement ...........................................31
VI.     The Learning and Working Environment ...........................................34
VI.A.       Patient Safety, Quality Improvement, Supervision, and Accountability...........34
VI.B.       Professionalism ................................................................................38
VI.C.       Well-Being .........................................................................................40
VI.D.       Fatigue Mitigation ............................................................................42
VI.E.       Clinical Responsibilities, Teamwork, and Transitions of Care.....43
VI.F.       Clinical Experience and Education ..................................................43

**Where applicable, text in italics describes the underlying philosophy of the requirements in that section. These philosophic statements are not program requirements and are therefore not citable.**

**Note: Review Committees may further specify only where indicated by "The Review Committee may/must further specify."**

**Introduction**

**Int.A.**          **Definition of Graduate Medical Education**

*Graduate medical education is the crucial step of professional development between medical school and autonomous clinical practice. It is in this vital phase of the continuum of medical education that residents learn to provide optimal patient care under the supervision of faculty members who not only instruct, but serve as role models of excellence, compassion, cultural sensitivity, professionalism, and scholarship.*

*Graduate medical education transforms medical students into physician scholars who care for the patient, patient's family, and a diverse community; create and integrate new knowledge into practice; and educate future generations of physicians to serve the public. Practice patterns established during graduate medical education persist many years later.*

*Graduate medical education has as a core tenet the graded authority and responsibility for patient care. The care of patients is undertaken with appropriate faculty supervision and conditional independence, allowing residents to attain the knowledge, skills, attitudes, judgment, and empathy required for autonomous practice. Graduate medical education develops physicians who focus on excellence in delivery of safe, equitable, affordable, quality care; and the health of the populations they serve. Graduate medical education values the strength that a diverse group of physicians brings to medical care, and the importance of inclusive and psychologically safe learning environments.*

*Graduate medical education occurs in clinical settings that establish the foundation for practice-based and lifelong learning. The professional development of the physician, begun in medical school, continues through faculty modeling of the effacement of self-interest in a humanistic environment that emphasizes joy in curiosity, problem-solving, academic rigor, and discovery. This transformation is often physically, emotionally, and intellectually demanding and occurs in a variety of clinical learning environments committed to graduate medical education and the well-being of patients, residents, fellows, faculty members, students, and all members of the health care team.*

**Int.B.**          **Definition of Specialty**
                     **[The Review Committee must further specify]**

**Int.C.**          **Length of Educational Program**

**[The Review Committee must further specify]**

**I.     Oversight**

**I.A.           Sponsoring Institution**

*The Sponsoring Institution is the organization or entity that assumes the ultimate financial and academic responsibility for a program of graduate medical education, consistent with the ACGME Institutional Requirements.*

*When the Sponsoring Institution is not a rotation site for the program, the most commonly utilized site of clinical activity for the program is the primary clinical site.*

---

**Background and Intent:** Participating sites will reflect the health care needs of the community and the educational needs of the residents. A wide variety of organizations may provide a robust educational experience and, thus, Sponsoring Institutions and participating sites may encompass inpatient and outpatient settings including, but not limited to a university, a medical school, a teaching hospital, a nursing home, a school of public health, a health department, a public health agency, an organized health care delivery system, a medical examiner's office, an educational consortium, a teaching health center, a physician group practice, federally qualified health center, or an educational foundation.

---

**I.A.1.                 The program must be sponsored by one ACGME-accredited Sponsoring Institution.** (Core)

**I.B.           Participating Sites**

*A participating site is an organization providing educational experiences or educational assignments/rotations for residents.*

**I.B.1.                 The program, with approval of its Sponsoring Institution, must designate a primary clinical site.** (Core)
**[The Review Committee may specify which other specialties/programs must be present at the primary clinical site]**

**I.B.2.                 There must be a program letter of agreement (PLA) between the program and each participating site that governs the relationship between the program and the participating site providing a required assignment.** (Core)

**I.B.2.a)                 The PLA must:**

**I.B.2.a).(1)                 be renewed at least every 10 years; and,** (Core)

**I.B.2.a).(2)                 be approved by the designated institutional official (DIO).** (Core)

**I.B.3.                 The program must monitor the clinical learning and working environment at all participating sites.** (Core)

I.B.3.a)          At each participating site there must be one faculty member, designated by the program director as the site director, who is accountable for resident education at that site, in collaboration with the program director. (Core)

---

**Background and Intent:** While all residency programs must be sponsored by a single ACGME-accredited Sponsoring Institution, many programs will utilize other clinical settings to provide required or elective training experiences. At times it is appropriate to utilize community sites that are not owned by or affiliated with the Sponsoring Institution. Some of these sites may be remote for geographic, transportation, or communication issues. When utilizing such sites, the program must ensure the quality of the educational experience.

Suggested elements to be considered in PLAs will be found in the Guide to the Common Program Requirements. These include:
- Identifying the faculty members who will assume educational and supervisory responsibility for residents
- Specifying the responsibilities for teaching, supervision, and formal evaluation of residents
- Specifying the duration and content of the educational experience
- Stating the policies and procedures that will govern resident education during the assignment

---

I.B.4.          The program director must submit any additions or deletions of participating sites routinely providing an educational experience, required for all residents, of one month full time equivalent (FTE) or more through the ACGME's Accreditation Data System (ADS). (Core) [The Review Committee may further specify]

I.C.          **Workforce Recruitment and Retention**

The program, in partnership with its Sponsoring Institution, must engage in practices that focus on mission-driven, ongoing, systematic recruitment and retention of a diverse and inclusive workforce of residents, fellows (if present), faculty members, senior administrative GME staff members, and other relevant members of its academic community. (Core)

---

**Background and Intent:** It is expected that the Sponsoring Institution has, and programs implement, policies and procedures related to recruitment and retention of individuals underrepresented in medicine and medical leadership in accordance with the Sponsoring Institution's mission and aims.

---

I.D.          **Resources**

I.D.1.          The program, in partnership with its Sponsoring Institution, must ensure the availability of adequate resources for resident education. (Core)

[The Review Committee must further specify]

**I.D.2.**  The program, in partnership with its Sponsoring Institution, must ensure healthy and safe learning and working environments that promote resident well-being and provide for:

**I.D.2.a)**  access to food while on duty; (Core)

**I.D.2.b)**  safe, quiet, clean, and private sleep/rest facilities available and accessible for residents with proximity appropriate for safe patient care; (Core)

> Background and Intent: Care of patients within a hospital or health system occurs continually through the day and night. Such care requires that residents function at their peak abilities, which requires the work environment to provide them with the ability to meet their basic needs within proximity of their clinical responsibilities. Access to food and rest are examples of these basic needs, which must be met while residents are working. Residents should have access to refrigeration where food may be stored. Food should be available when residents are required to be in the hospital overnight. Rest facilities are necessary, even when overnight call is not required, to accommodate the fatigued resident.

**I.D.2.c)**  clean and private facilities for lactation that have refrigeration capabilities, with proximity appropriate for safe patient care; (Core)

> Background and Intent: Sites must provide private and clean locations where residents may lactate and store the milk within a refrigerator. These locations should be in close proximity to clinical responsibilities. It would be helpful to have additional support within these locations that may assist the resident with the continued care of patients, such as a computer and a phone. While space is important, the time required for lactation is also critical for the well-being of the resident and the resident's family, as outlined in VI.C.1.c).(1)

**I.D.2.d)**  security and safety measures appropriate to the participating site; and, (Core)

**I.D.2.e)**  accommodations for residents with disabilities consistent with the Sponsoring Institution's policy. (Core)

**I.D.3.**  Residents must have ready access to specialty-specific and other appropriate reference material in print or electronic format. This must include access to electronic medical literature databases with full text capabilities. (Core)

**I.E.**  Other Learners and Health Care Personnel

The presence of other learners and other health care personnel, including, but not limited to residents from other programs, subspecialty fellows, and advanced practice providers, must not negatively impact the appointed residents' education. (Core)

[The Review Committee may further specify]

> Background and Intent: The clinical learning environment has become increasingly complex and often includes care providers, students, and post-graduate residents and fellows from multiple disciplines. The presence of these practitioners and their learners enriches the learning environment. Programs have a responsibility to monitor the learning environment to ensure that residents' education is not compromised by the presence of other providers and learners.

II.        **Personnel**

II.A.            **Program Director**

II.A.1.            There must be one faculty member appointed as program director with authority and accountability for the overall program, including compliance with all applicable program requirements. (Core)

II.A.1.a)            The Sponsoring Institution's GMEC must approve a change in program director and must verify the program director's licensure and clinical appointment. (Core)

II.A.1.a).(1)            Final approval of the program director resides with the Review Committee. (Core) [Previously II.A.1.b)] [For specialties that require Review Committee approval of the program director, the Review Committee may further specify. This requirement will be deleted for those specialties that do not require Review Committee approval of the program director.]

> Background and Intent: While the ACGME recognizes the value of input from numerous individuals in the management of a residency, a single individual must be designated as program director and have overall responsibility for the program. The program director's nomination is reviewed and approved by the GMEC.

II.A.1.b)            The program must demonstrate retention of the program director for a length of time adequate to maintain continuity of leadership and program stability. (Core) [The Review Committee may further specify]

> Background and Intent: The success of residency programs is generally enhanced by continuity in the program director position. The professional activities required of a program director are unique and complex and take time to master. All programs are encouraged to undertake succession planning to facilitate program stability when there is necessary turnover in the program director position.

II.A.2.            The program director and, as applicable, the program's leadership team, must be provided with support adequate for administration of the program based upon its size and configuration. (Core) [The Review Committee must further specify minimum dedicated time for program administration, and will determine whether

**program leadership refers to the program director or both the program director and associate/assistant program director(s).]**

**Background and Intent: To achieve successful graduate medical education, individuals serving as education and administrative leaders of residency programs, as well as those significantly engaged in the education, supervision, evaluation, and mentoring of residents, must have sufficient dedicated professional time to perform the vital activities required to sustain an accredited program.**

**The ultimate outcome of graduate medical education is excellence in resident education and patient care.**

**The program director and, as applicable, the program leadership team, devote a portion of their professional effort to the oversight and management of the residency program, as defined in II.A.4.-II.A.4.a).(16). Both provision of support for the time required for the leadership effort and flexibility regarding how this support is provided are important. Programs, in partnership with their Sponsoring Institutions, may provide support for this time in a variety of ways. Examples of support may include, but are not limited to, salary support, supplemental compensation, educational value units, or relief of time from other professional duties.**

**Program directors and, as applicable, members of the program leadership team, who are new to the role may need to devote additional time to program oversight and management initially as they learn and become proficient in administering the program. It is suggested that during this initial period the support described above be increased as needed.**

**In addition, it is important to remember that the dedicated time and support requirement for ACGME activities is a *minimum*, recognizing that, depending on the unique needs of the program, additional support may be warranted. The need to ensure adequate resources, including adequate support and dedicated time for the program director, is also addressed in Institutional Requirement II.B.1. The amount of support and dedicated time needed for individual programs will vary based on a number of factors and may exceed the minimum specified in the applicable specialty/subspecialty-specific Program Requirements. It is expected that the Sponsoring Institution, in partnership with its accredited programs, will ensure support for program directors to fulfill their program responsibilities effectively.**

**II.A.3.**  **Qualifications of the program director:**

**II.A.3.a)**  **must include specialty expertise and at least three years of documented educational and/or administrative experience, or qualifications acceptable to the Review Committee;** [(Core)]

**Background and Intent: Leading a program requires knowledge and skills that are established during residency and subsequently further developed. The time period from completion of residency until assuming the role of program director allows the individual to cultivate leadership abilities while becoming professionally established. The three-year period is intended for the individual's professional maturation.**

The broad allowance for educational and/or administrative experience recognizes that strong leaders arise through diverse pathways. These areas of expertise are important when identifying and appointing a program director. The choice of a program director should be informed by the mission of the program and the needs of the community.

In certain circumstances, the program and Sponsoring Institution may propose and the Review Committee may accept a candidate for program director who fulfills these goals but does not meet the three-year minimum.

II.A.3.b)    must include current certification in the specialty for which they are the program director by the American Board of \_\_\_\_\_ or by the American Osteopathic Board of \_\_\_\_\_, or specialty qualifications that are acceptable to the Review Committee; and, (Core)
[The Review Committee may further specify acceptable specialty qualifications or that only ABMS and AOA certification will be considered acceptable]

II.A.3.c)    must include ongoing clinical activity. (Core)

Background and Intent: A program director is a role model for faculty members and residents. The program director must participate in clinical activity consistent with the specialty. This activity will allow the program director to role model the Core Competencies for the faculty members and residents.

[The Review Committee may further specify additional program director qualifications]

II.A.4.    Program Director Responsibilities

The program director must have responsibility, authority, and accountability for: administration and operations; teaching and scholarly activity; resident recruitment and selection, evaluation, and promotion of residents, and disciplinary action; supervision of residents; and resident education in the context of patient care. (Core)

II.A.4.a)    The program director must:

II.A.4.a).(1)    be a role model of professionalism; (Core)

Background and Intent: The program director, as the leader of the program, must serve as a role model to residents in addition to fulfilling the technical aspects of the role. As residents are expected to demonstrate compassion, integrity, and respect for others, they must be able to look to the program director as an exemplar. It is of utmost importance, therefore, that the program director model outstanding professionalism, high quality patient care, educational excellence, and a scholarly approach to work. The program director creates an environment where respectful discussion is welcome, with the goal of continued improvement of the educational experience.

**II.A.4.a).(2)**                    design and conduct the program in a fashion consistent with the needs of the community, the mission(s) of the Sponsoring Institution, and the mission(s) of the program; (Core)

> **Background and Intent:** The mission of institutions participating in graduate medical education is to improve the health of the public. Each community has health needs that vary based upon location and demographics. Programs must understand the structural and social determinants of health of the populations they serve and incorporate them in the design and implementation of the program curriculum, with the ultimate goal of addressing these needs and eliminating health disparities.

**II.A.4.a).(3)**                    administer and maintain a learning environment conducive to educating the residents in each of the ACGME Competency domains; (Core)

> **Background and Intent:** The program director may establish a leadership team to assist in the accomplishment of program goals. Residency programs can be highly complex. In a complex organization, the leader typically has the ability to delegate authority to others, yet remains accountable. The leadership team may include physician and non-physician personnel with varying levels of education, training, and experience.

**II.A.4.a).(4)**                    have the authority to approve or remove physicians and non-physicians as faculty members at all participating sites, including the designation of core faculty members, and must develop and oversee a process to evaluate candidates prior to approval; (Core)

> **Background and Intent:** The provision of optimal and safe patient care requires a team approach. The education of residents by non-physician educators may enable the resident to better manage patient care and provides valuable advancement of the residents' knowledge. Furthermore, other individuals contribute to the education of residents in the basic science of the specialty or in research methodology. If the program director determines that the contribution of a non-physician individual is significant to the education of the residents, the program director may designate the individual as a program faculty member or a program core faculty member.

**II.A.4.a).(5)**                    have the authority to remove residents from supervising interactions and/or learning environments that do not meet the standards of the program; (Core)

> **Background and Intent:** The program director has the responsibility to ensure that all who educate residents effectively role model the Core Competencies. Working with a resident is a privilege that is earned through effective teaching and professional role modeling. This privilege may be removed by the program director when the standards of the clinical learning environment are not met.

> **There may be faculty in a department who are not part of the educational program, and the program director controls who is teaching the residents.**

II.A.4.a).(6)     submit accurate and complete information required and requested by the DIO, GMEC, and ACGME; (Core)

> **Background and Intent: This includes providing information in the form and format requested by the ACGME and obtaining requisite sign-off by the DIO.**

II.A.4.a).(7)     provide a learning and working environment in which residents have the opportunity to raise concerns, report mistreatment, and provide feedback in a confidential manner as appropriate, without fear of intimidation or retaliation; (Core)

II.A.4.a).(8)     ensure the program's compliance with the Sponsoring Institution's policies and procedures related to grievances and due process, including when action is taken to suspend or dismiss, or not to promote or renew the appointment of a resident; (Core)

> **Background and Intent: A program does not operate independently of its Sponsoring Institution. It is expected that the program director will be aware of the Sponsoring Institution's policies and procedures, and will ensure they are followed by the program's leadership, faculty members, support personnel, and residents.**

II.A.4.a).(9)     ensure the program's compliance with the Sponsoring Institution's policies and procedures on employment and non-discrimination; (Core)

II.A.4.a).(9).(a)     Residents must not be required to sign a non-competition guarantee or restrictive covenant. (Core)

II.A.4.a).(10)     document verification of education for all residents within 30 days of completion of or departure from the program; and, (Core)

II.A.4.a).(11)     provide verification of an individual resident's education upon the resident's request, within 30 days; and (Core)

> **Background and Intent: Primary verification of graduate medical education is important to credentialing of physicians for further training and practice. Such verification must be accurate and timely. Sponsoring Institution and program policies for record retention are important to facilitate timely documentation of residents who have previously completed the program. Residents who leave the program prior to completion also require timely documentation of their summative evaluation.**

II.A.4.a).(12)                    **provide applicants who are offered an interview with information related to the applicant's eligibility for the relevant specialty board examination(s).** [(Core)]
**[This requirement may be omitted at the discretion of the Review Committee]**

II.B.          **Faculty**

*Faculty members are a foundational element of graduate medical education – faculty members teach residents how to care for patients. Faculty members provide an important bridge allowing residents to grow and become practice-ready, ensuring that patients receive the highest quality of care. They are role models for future generations of physicians by demonstrating compassion, commitment to excellence in teaching and patient care, professionalism, and a dedication to lifelong learning. Faculty members experience the pride and joy of fostering the growth and development of future colleagues. The care they provide is enhanced by the opportunity to teach and model exemplary behavior. By employing a scholarly approach to patient care, faculty members, through the graduate medical education system, improve the health of the individual and the population.*

*Faculty members ensure that patients receive the level of care expected from a specialist in the field. They recognize and respond to the needs of the patients, residents, community, and institution. Faculty members provide appropriate levels of supervision to promote patient safety. Faculty members create an effective learning environment by acting in a professional manner and attending to the well-being of the residents and themselves.*

> **Background and Intent:** "Faculty" refers to the entire teaching force responsible for educating residents. The term "faculty," including "core faculty," does not imply or require an academic appointment.

II.B.1.          **There must be a sufficient number of faculty members with competence to instruct and supervise all residents.** [(Core)]
**[The Review Committee may further specify]**

II.B.2.          **Faculty members must:**

II.B.2.a)          **be role models of professionalism;** [(Core)]

II.B.2.b)          **demonstrate commitment to the delivery of safe, equitable, high-quality, cost-effective, patient-centered care;** [(Core)]

> **Background and Intent:** Patients have the right to expect quality, cost-effective care with patient safety at its core. The foundation for meeting this expectation is formed during residency and fellowship. Faculty members model these goals and continually strive for improvement in care and cost, embracing a commitment to the patient and the community they serve.

**II.B.2.c)**              demonstrate a strong interest in the education of residents, including devoting sufficient time to the educational program to fulfill their supervisory and teaching responsibilities; (Core)

**II.B.2.d)**              administer and maintain an educational environment conducive to educating residents; (Core)

**II.B.2.e)**              regularly participate in organized clinical discussions, rounds, journal clubs, and conferences; and, (Core)

**II.B.2.f)**              pursue faculty development designed to enhance their skills at least annually: (Core)

> **Background and Intent: Faculty development is intended to describe structured programming developed for the purpose of enhancing transference of knowledge, skill, and behavior from the educator to the learner. Faculty development may occur in a variety of configurations (lecture, workshop, etc.) using internal and/or external resources. Programming is typically needs-based (individual or group) and may be specific to the institution or the program. Faculty development programming is to be reported for the residency program faculty in the aggregate.**

**II.B.2.f).(1)**              as educators and evaluators; (Detail)

**II.B.2.f).(2)**              in quality improvement, eliminating health inequities, and patient safety; (Detail)

**II.B.2.f).(3)**              in fostering their own and their residents' well-being; and, (Detail)

**II.B.2.f).(4)**              in patient care based on their practice-based learning and improvement efforts. (Detail)

> **Background and Intent: Practice-based learning serves as the foundation for the practice of medicine. Through a systematic analysis of one's practice and review of the literature, one is able to make adjustments that improve patient outcomes and care. Thoughtful consideration to practice-based analysis improves quality of care, as well as patient safety. This allows faculty members to serve as role models for residents in practice-based learning.**

                    **[The Review Committee may further specify additional faculty responsibilities]**

**II.B.3.**              **Faculty Qualifications**

**II.B.3.a)**              **Faculty members must have appropriate qualifications in their field and hold appropriate institutional appointments.** (Core)

                    **[The Review Committee may further specify]**

**II.B.3.b)**              **Physician faculty members must:**

II.B.3.b).(1)                          have current certification in the specialty by the
                                       American Board of _____ or the American Osteopathic
                                       Board of _____, or possess qualifications judged
                                       acceptable to the Review Committee. (Core)

                                       [The Review Committee may further specify additional
                                       qualifications and/or requirements regarding non-physician
                                       faculty members]

II.B.4.              Core Faculty

                     Core faculty members must have a significant role in the education
                     and supervision of residents and must devote a significant portion
                     of their entire effort to resident education and/or administration, and
                     must, as a component of their activities, teach, evaluate, and
                     provide formative feedback to residents. (Core)

> Background and Intent: Core faculty members are critical to the success of resident
> education. They support the program leadership in developing, implementing, and
> assessing curriculum, mentoring residents, and assessing residents' progress toward
> achievement of competence in and the autonomous practice of the specialty. Core
> faculty members should be selected for their broad knowledge of and involvement in
> the program, permitting them to effectively evaluate the program. Core faculty
> members may also be selected for their specific expertise and unique contribution to
> the program. Core faculty members are engaged in a broad range of activities, which
> may vary across programs and specialties. Core faculty members provide clinical
> teaching and supervision of residents, and also participate in non-clinical activities
> related to resident education and program administration. Examples of these non-
> clinical activities include, but are not limited to, interviewing and selecting resident
> applicants, providing didactic instruction, mentoring residents, simulation exercises,
> completing the annual ACGME Faculty Survey, and participating on the program's
> Clinical Competency Committee, Program Evaluation Committee, and other GME
> committees.

II.B.4.a)                              Core faculty members must complete the annual ACGME
                                       Faculty Survey. (Core)

                                       [The Review Committee must specify the minimum number of core
                                       faculty and/or the core faculty-resident ratio]

                                       [The Review Committee may further specify either:
                                       (1) requirements regarding dedicated time and support for core
                                           faculty members' non-clinical responsibilities related to resident
                                           education and/or administration of the program, or

                                       (2) requirements regarding the role and responsibilities of core
                                           faculty members, inclusive of both clinical and non-clinical
                                           activities, and the corresponding time commitment required to
                                           meet those responsibilities.]

*If the Review Committee adds requirements as described in number (1) above, the Review Committee may choose to include background and intent as follows:*

**Background and Intent: Provision of support for the time required for the core faculty members' responsibilities related to resident education and/or administration of the program, as well as flexibility regarding how this support is provided, are important. Programs, in partnership with their Sponsoring Institutions, may provide support for this time in a variety of ways. Examples of support may include, but are not limited to, salary support, supplemental compensation, educational value units, or relief of time from other professional duties.**

**It is important to remember that the dedicated time and support requirement is a *minimum*, recognizing that, depending on the unique needs of the program, additional support may be warranted. The need to ensure adequate resources, including adequate support and dedicated time for the core faculty members, is also addressed in Institutional Requirement II.B.2. The amount of support and dedicated time needed for individual programs will vary based on a number of factors and may exceed the minimum specified in the applicable specialty-/subspecialty-specific Program Requirements.**

*If the Review Committee adds requirements as described in number (2) above, the following Background and Intent must be included:*

**Background and Intent: The core faculty time requirements address the role and responsibilities of core faculty members, inclusive of both clinical and non-clinical activities, and the corresponding time to meet those responsibilities. The requirements do not address how this is accomplished, and do not mandate dedicated or protected time for these activities. Programs, in partnership with their Sponsoring Institutions, will determine how compliance with the requirements is achieved.**

**[The Review Committee may specify requirements specific to associate program director(s)]**

**II.C.**        **Program Coordinator**

**II.C.1.**        **There must be a program coordinator.** (Core)

**II.C.2.**        **The program coordinator must be provided with dedicated time and support adequate for administration of the program based upon its size and configuration.** (Core)
**[The Review Committee must further specify minimum dedicated time for the program coordinator]**

**Background and Intent: The requirement does not address the source of funding required to provide the specified salary support.**

**Each program requires a lead administrative person, frequently referred to as a program coordinator, administrator, or as otherwise titled by the institution. This person will frequently manage the day-to-day operations of the program and serve as**

an important liaison and facilitator between the learners, faculty and other staff members, and the ACGME. Individuals serving in this role are recognized as program coordinators by the ACGME.

The program coordinator is a key member of the leadership team and is critical to the success of the program. As such, the program coordinator must possess skills in leadership and personnel management appropriate to the complexity of the program. Program coordinators are expected to develop in-depth knowledge of the ACGME and Program Requirements, including policies and procedures. Program coordinators assist the program director in meeting accreditation requirements, educational programming, and support of residents.

Programs, in partnership with their Sponsoring Institutions, should encourage the professional development of their program coordinators and avail them of opportunities for both professional and personal growth. Programs with fewer residents may not require a full-time coordinator; one coordinator may support more than one program.

The minimum required dedicated time and support specified in II.C.2.a) is inclusive of activities directly related to administration of the accredited program. It is understood that coordinators often have additional responsibilities, beyond those directly related to program administration, including, but not limited to, departmental administrative responsibilities, medical school clerkships, planning lectures that are not solely intended for the accredited program, and mandatory reporting for entities other than the ACGME. Assignment of these other responsibilities will necessitate consideration of allocation of additional support so as not to preclude the coordinator from devoting the time specified above solely to administrative activities that support the accredited program.

In addition, it is important to remember that the dedicated time and support requirement for ACGME activities is a minimum, recognizing that, depending on the unique needs of the program, additional support may be warranted. The need to ensure adequate resources, including adequate support and dedicated time for the program coordinator, is also addressed in Institutional Requirement II.B.4. The amount of support and dedicated time needed for individual programs will vary based on a number of factors and may exceed the minimum specified in the applicable specialty/subspecialty-specific Program Requirements. It is expected that the Sponsoring Institution, in partnership with its accredited programs, will ensure support for program coordinators to fulfill their program responsibilities effectively.

II.D.    Other Program Personnel

The program, in partnership with its Sponsoring Institution, must jointly ensure the availability of necessary personnel for the effective administration of the program. (Core)
[The Review Committee may further specify]

Background and Intent: Multiple personnel may be required to effectively administer a program. These may include staff members with clerical skills, project managers, education experts, and staff members to maintain electronic communication for the

program. These personnel may support more than one program in more than one discipline.

III.    Resident Appointments

III.A.    Eligibility Requirements

III.A.1.    An applicant must meet one of the following qualifications to be eligible for appointment to an ACGME-accredited program: (Core)

III.A.1.a)    graduation from a medical school in the United States or Canada, accredited by the Liaison Committee on Medical Education (LCME) or graduation from a college of osteopathic medicine in the United States, accredited by the American Osteopathic Association Commission on Osteopathic College Accreditation (AOACOCA); or, (Core)

III.A.1.b)    graduation from a medical school outside of the United States or Canada, and meeting one of the following additional qualifications: (Core)

III.A.1.b).(1)    holding a currently valid certificate from the Educational Commission for Foreign Medical Graduates (ECFMG) prior to appointment; or, (Core)

III.A.1.b).(2)    holding a full and unrestricted license to practice medicine in the United States licensing jurisdiction in which the ACGME-accredited program is located. (Core)

III.A.2.    All prerequisite post-graduate clinical education required for initial entry or transfer into ACGME-accredited residency programs must be completed in ACGME-accredited residency programs, AOA-approved residency programs, Royal College of Physicians and Surgeons of Canada (RCPSC)-accredited or College of Family Physicians of Canada (CFPC)-accredited residency programs located in Canada, or in residency programs with ACGME International (ACGME-I) Advanced Specialty Accreditation. (Core)

III.A.2.a)    Residency programs must receive verification of each resident's level of competency in the required clinical field using ACGME, CanMEDS, or ACGME-I Milestones evaluations from the prior training program upon matriculation. (Core)
[The Review Committee may further specify prerequisite postgraduate clinical education]

Background and Intent: Programs with ACGME-I Foundational Accreditation or from institutions with ACGME-I accreditation do not qualify unless the program has also achieved ACGME-I Advanced Specialty Accreditation. To ensure entrants into ACGME-accredited programs from ACGME-I programs have attained the prerequisite milestones for this training, they must be from programs that have ACGME-I Advanced Specialty Accreditation.

**III.A.3.**        **Resident Eligibility Exception**

The Review Committee for _____ will allow the following exception to the resident eligibility requirements: [Core]
[Note: A Review Committee may permit the eligibility exception if the specialty requires completion of a prerequisite residency program prior to admission. If the specialty-specific Program Requirements define multiple program formats, the Review Committee may permit the exception only for the format(s) that require completion of a prerequisite residency program prior to admission. If this language is not applicable, this section will not appear in the specialty-specific requirements.]

**III.A.3.a)**        An ACGME-accredited residency program may accept an exceptionally qualified international graduate applicant who does not satisfy the eligibility requirements listed in III.A.1.-III.A.2., but who does meet all of the following additional qualifications and conditions: [Core]

**III.A.3.a).(1)**        evaluation by the program director and residency selection committee of the applicant's suitability to enter the program, based on prior training and review of the summative evaluations of this training; and, [Core]

**III.A.3.a).(2)**        review and approval of the applicant's exceptional qualifications by the GMEC; and, [Core]

**III.A.3.a).(3)**        verification of Educational Commission for Foreign Medical Graduates (ECFMG) certification. [Core]

**III.A.3.b)**        Applicants accepted through this exception must have an evaluation of their performance by the Clinical Competency Committee within 12 weeks of matriculation. [Core]

**III.B.**    **Resident Complement**

The program director must not appoint more residents than approved by the Review Committee. [Core]
[The Review Committee may further specify minimum complement numbers]

---

Background and Intent: Programs are required to request approval of all complement changes, whether temporary or permanent, by the Review Committee through ADS. Permanent increases require prior approval from the Review Committee and temporary increases may also require approval. Specialty-specific instructions for requesting a complement increase are found in the "Documents and Resources" page of the applicable specialty section of the ACGME website.

---

**III.C.**        **Resident Transfers**

The program must obtain verification of previous educational experiences and a summative competency-based performance evaluation prior to acceptance of a transferring resident, and Milestones evaluations upon matriculation. (Core)

[The Review Committee may further specify]

IV. **Educational Program**

*The ACGME accreditation system is designed to encourage excellence and innovation in graduate medical education regardless of the organizational affiliation, size, or location of the program.*

*The educational program must support the development of knowledgeable, skillful physicians who provide compassionate care.*

*It is recognized programs may place different emphasis on research, leadership, public health, etc. It is expected that the program aims will reflect the nuanced program-specific goals for it and its graduates; for example, it is expected that a program aiming to prepare physician-scientists will have a different curriculum from one focusing on community health.*

IV.A. **Educational Components**

The curriculum must contain the following educational components:

IV.A.1. a set of program aims consistent with the Sponsoring Institution's mission, the needs of the community it serves, and the desired distinctive capabilities of its graduates, which must be made available to program applicants, residents, and faculty members; (Core)

IV.A.2. competency-based goals and objectives for each educational experience designed to promote progress on a trajectory to autonomous practice. These must be distributed, reviewed, and available to residents and faculty members; (Core)

Background and Intent: The trajectory to autonomous practice is documented by Milestones evaluations. Milestones are considered formative and should be used to identify learning needs. Milestones data may lead to focused or general curricular revision in any given program or to individualized learning plans for any specific resident.

IV.A.3. delineation of resident responsibilities for patient care, progressive responsibility for patient management, and graded supervision; (Core)

Background and Intent: These responsibilities may generally be described by PGY level and specifically by Milestones progress as determined by the Clinical Competency Committee. This approach encourages the transition to competency-based education. An advanced learner may be granted more responsibility independent of PGY level and a learner needing more time to accomplish a certain task may do so in a focused rather than global manner.

**IV.A.4.**          **a broad range of structured didactic activities; and,** (Core)

**IV.A.4.a)**          **Residents must be provided with protected time to participate in core didactic activities.** (Core)

> **Background and Intent: It is intended that residents will participate in structured didactic activities. It is recognized that there may be circumstances in which this is not possible. Programs should define core didactic activities for which time is protected and the circumstances in which residents may be excused from these didactic activities. Didactic activities may include, but are not limited to, lectures, conferences, courses, labs, asynchronous learning, simulations, drills, case discussions, grand rounds, didactic teaching, and education in critical appraisal of medical evidence.**

**IV.A.5.**          **formal educational activities that promote patient safety-related goals, tools, and techniques.** (Core)

**IV.B.**          **ACGME Competencies**

> **Background and Intent: The Competencies provide a conceptual framework describing the required domains for a trusted physician to enter autonomous practice. These Competencies are core to the practice of all physicians, although the specifics are further defined by each specialty. The developmental trajectories in each of the Competencies are articulated through the Milestones for each specialty.**

**IV.B.1.**          **The program must integrate the following ACGME Competencies into the curriculum:**

**IV.B.1.a)**          **Professionalism**

          **Residents must demonstrate a commitment to professionalism and an adherence to ethical principles.** (Core)

**IV.B.1.a).(1)**          **Residents must demonstrate competence in:**

**IV.B.1.a).(1).(a)**          **compassion, integrity, and respect for others;** (Core)

**IV.B.1.a).(1).(b)**          **responsiveness to patient needs that supersedes self-interest;** (Core)

**IV.B.1.a).(1).(c)**          **cultural humility;** (Core)

**IV.B.1.a).(1).(d)**          **respect for patient privacy and autonomy;** (Core)

**IV.B.1.a).(1).(e)**          **accountability to patients, society, and the profession;** (Core)

**IV.B.1.a).(1).(f)**          **respect and responsiveness to diverse patient populations, including but not limited to**

diversity in gender, age, culture, race, religion, disabilities, national origin, socioeconomic status, and sexual orientation; (Core)

IV.B.1.a).(1).(g)    ability to recognize and develop a plan for one's own personal and professional well-being; and, (Core)

IV.B.1.a).(1).(h)    appropriately disclosing and addressing conflict or duality of interest. (Core)

Background and Intent: This includes the recognition that under certain circumstances, the interests of the patient may be best served by transitioning care to another practitioner. Examples include fatigue, conflict or duality of interest, not connecting well with a patient, or when another physician would be better for the situation based on skill set or knowledge base.

IV.B.1.b)    Patient Care and Procedural Skills

Background and Intent: Quality patient care is safe, effective, timely, efficient, patient-centered, equitable, and designed to improve population health, while reducing per capita costs. In addition, there should be a focus on improving the clinician's well-being as a means to improve patient care and reduce burnout among residents, fellows, and practicing physicians.

IV.B.1.b).(1)    Residents must be able to provide patient care that is patient- and family-centered, compassionate, equitable, appropriate, and effective for the treatment of health problems and the promotion of health. (Core) [The Review Committee must further specify]

IV.B.1.b).(2)    Residents must be able to perform all medical, diagnostic, and surgical procedures considered essential for the area of practice. (Core) [The Review Committee may further specify]

IV.B.1.c)    Medical Knowledge

Residents must demonstrate knowledge of established and evolving biomedical, clinical, epidemiological, and social-behavioral sciences, including scientific inquiry, as well as the application of this knowledge to patient care. (Core) [The Review Committee must further specify]

IV.B.1.d)    Practice-based Learning and Improvement

Residents must demonstrate the ability to investigate and evaluate their care of patients, to appraise and assimilate scientific evidence, and to continuously improve patient care based on constant self-evaluation and lifelong learning. (Core)

| | |
|---|---|
| **IV.B.1.d).(1)** | **Residents must demonstrate competence in:** |
| **IV.B.1.d).(1).(a)** | **identifying strengths, deficiencies, and limits in one's knowledge and expertise;** (Core) |
| **IV.B.1.d).(1).(b)** | **setting learning and improvement goals;** (Core) |
| **IV.B.1.d).(1).(c)** | **identifying and performing appropriate learning activities;** (Core) |
| **IV.B.1.d).(1).(d)** | **systematically analyzing practice using quality improvement methods, including activities aimed at reducing health care disparities, and implementing changes with the goal of practice improvement;** (Core) |
| **IV.B.1.d).(1).(e)** | **incorporating feedback and formative evaluation into daily practice; and,** (Core) |
| **IV.B.1.d).(1).(f)** | **locating, appraising, and assimilating evidence from scientific studies related to their patients' health problems.** (Core) |
| | **[The Review Committee may further specify by adding to the list of sub-competencies]** |
| **IV.B.1.e)** | **Interpersonal and Communication Skills** |
| | **Residents must demonstrate interpersonal and communication skills that result in the effective exchange of information and collaboration with patients, their families, and health professionals.** (Core) |
| **IV.B.1.e).(1)** | **Residents must demonstrate competence in:** |
| **IV.B.1.e).(1).(a)** | **communicating effectively with patients and patients' families, as appropriate, across a broad range of socioeconomic circumstances, cultural backgrounds, and language capabilities, learning to engage interpretive services as required to provide appropriate care to each patient;** (Core) |
| **IV.B.1.e).(1).(b)** | **communicating effectively with physicians, other health professionals, and health-related agencies;** (Core) |
| **IV.B.1.e).(1).(c)** | **working effectively as a member or leader of a health care team or other professional group;** (Core) |

**IV.B.1.e).(1).(d)**  educating patients, patients' families, students, other residents, and other health professionals; (Core)

**IV.B.1.e).(1).(e)**  acting in a consultative role to other physicians and health professionals; (Core)

**IV.B.1.e).(1).(f)**  maintaining comprehensive, timely, and legible health care records, if applicable. (Core)

**IV.B.1.e).(2)**  Residents must learn to communicate with patients and patients' families to partner with them to assess their care goals, including, when appropriate, end-of-life goals. (Core)

[The Review Committee may further specify by adding to the list of sub-competencies]

**IV.B.1.f)**  Systems-based Practice

Residents must demonstrate an awareness of and responsiveness to the larger context and system of health care, including the structural and social determinants of health, as well as the ability to call effectively on other resources to provide optimal health care. (Core)

Background and Intent: Medical practice occurs in the context of an increasingly complex clinical care environment where optimal patient care requires attention to compliance with external and internal administrative and regulatory requirements.

**IV.B.1.f).(1)**  Residents must demonstrate competence in:

**IV.B.1.f).(1).(a)**  working effectively in various health care delivery settings and systems relevant to their clinical specialty; (Core)

**IV.B.1.f).(1).(b)**  coordinating patient care across the health care continuum and beyond as relevant to their clinical specialty; (Core)

Background and Intent: Every patient deserves to be treated as a whole person. Therefore it is recognized that any one component of the health care system does not meet the totality of the patient's needs. An appropriate transition plan requires coordination and forethought by an interdisciplinary team. The patient benefits from proper care and the system benefits from proper use of resources.

**IV.B.1.f).(1).(c)**  advocating for quality patient care and optimal patient care systems; (Core)

| | |
|---|---|
| IV.B.1.f).(1).(d) | participating in identifying system errors and implementing potential systems solutions; (Core) |
| IV.B.1.f).(1).(e) | incorporating considerations of value, equity, cost awareness, delivery and payment, and risk-benefit analysis in patient and/or population-based care as appropriate;(Core) |
| IV.B.1.f).(1).(f) | understanding health care finances and its impact on individual patients' health decisions; and, (Core) |
| IV.B.1.f).(1).(g) | using tools and techniques that promote patient safety and disclosure of patient safety events (real or simulated). (Detail) |
| IV.B.1.f).(2) | Residents must learn to advocate for patients within the health care system to achieve the patient's and patient's family's care goals, including, when appropriate, end-of-life goals. (Core) |
| | [The Review Committee may further specify by adding to the list of sub-competencies] |

**IV.C.**    Curriculum Organization and Resident Experiences

IV.C.1.    The curriculum must be structured to optimize resident educational experiences, the length of the experiences, and the supervisory continuity. These educational experiences include an appropriate blend of supervised patient care responsibilities, clinical teaching, and didactic educational events. (Core)
[The Review Committee must further specify]

Background and Intent: In some specialties, frequent rotational transitions, inadequate continuity of faculty member supervision, and dispersed patient locations within the hospital have adversely affected optimal resident education and effective team-based care. The need for patient care continuity varies from specialty to specialty and by clinical situation, and may be addressed by the individual Review Committee.

IV.C.2.    The program must provide instruction and experience in pain management if applicable for the specialty, including recognition of the signs of substance use disorder. (Core)
[The Review Committee may further specify]

[The Review Committee may specify required didactic and clinical experiences]

**IV.D.**    Scholarship

*Medicine is both an art and a science. The physician is a humanistic scientist who cares for patients. This requires the ability to think critically, evaluate the literature, appropriately assimilate new knowledge, and practice lifelong learning. The program and faculty must create an environment that fosters the acquisition of such skills through resident participation in scholarly activities. Scholarly activities may include discovery, integration, application, and teaching.*

*The ACGME recognizes the diversity of residencies and anticipates that programs prepare physicians for a variety of roles, including clinicians, scientists, and educators. It is expected that the program's scholarship will reflect its mission(s) and aims, and the needs of the community it serves. For example, some programs may concentrate their scholarly activity on quality improvement, population health, and/or teaching, while other programs might choose to utilize more classic forms of biomedical research as the focus for scholarship.*

**IV.D.1.**    **Program Responsibilities**

**IV.D.1.a)**    **The program must demonstrate evidence of scholarly activities consistent with its mission(s) and aims. (Core)**

**IV.D.1.b)**    **The program, in partnership with its Sponsoring Institution, must allocate adequate resources to facilitate resident and faculty involvement in scholarly activities. (Core)**
**[The Review Committee may further specify]**

**IV.D.1.c)**    **The program must advance residents' knowledge and practice of the scholarly approach to evidence-based patient care. (Core)**

**IV.D.2.**    **Faculty Scholarly Activity**

**IV.D.2.a)**    **Among their scholarly activity, programs must demonstrate accomplishments in at least three of the following domains: (Core)**

- **Research in basic science, education, translational science, patient care, or population health**
- **Peer-reviewed grants**
- **Quality improvement and/or patient safety initiatives**
- **Systematic reviews, meta-analyses, review articles, chapters in medical textbooks, or case reports**
- **Creation of curricula, evaluation tools, didactic educational activities, or electronic educational materials**
- **Contribution to professional committees, educational organizations, or editorial boards**
- **Innovations in education**

**IV.D.2.b)**                The program must demonstrate dissemination of scholarly activity within and external to the program by the following methods:
[Review Committee will choose to require either IV.D.2.b).(1) or both IV.D.2.b).(1) and IV.D.2.b).(2)]

> **Background and Intent:** For the purposes of education, metrics of scholarly activity represent one of the surrogates for the program's effectiveness in the creation of an environment of inquiry that advances the residents' scholarly approach to patient care. The Review Committee will evaluate the dissemination of scholarship for the program as a whole, not for individual faculty members, for a five-year interval, for both core and non-core faculty members, with the goal of assessing the effectiveness of the creation of such an environment. The ACGME recognizes that there may be differences in scholarship requirements between different specialties and between residencies and fellowships in the same specialty.

**IV.D.2.b).(1)**           faculty participation in grand rounds, posters, workshops, quality improvement presentations, podium presentations, grant leadership, non-peer-reviewed print/electronic resources, articles or publications, book chapters, textbooks, webinars, service on professional committees, or serving as a journal reviewer, journal editorial board member, or editor; (Outcome)

**IV.D.2.b).(2)**           peer-reviewed publication. (Outcome)

**IV.D.3.**          Resident Scholarly Activity

**IV.D.3.a)**        Residents must participate in scholarship. (Core)
[The Review Committee may further specify]

**V.    Evaluation**

**V.A.          Resident Evaluation**

**V.A.1.          Feedback and Evaluation**

> **Background and Intent:** Feedback is ongoing information provided regarding aspects of one's performance, knowledge, or understanding. The faculty empower residents to provide much of that feedback themselves in a spirit of continuous learning and self-reflection. Feedback from faculty members in the context of routine clinical care should be frequent, and need not always be formally documented.
>
> Formative and summative evaluation have distinct definitions. Formative evaluation is *monitoring resident learning* and providing ongoing feedback that can be used by residents to improve their learning in the context of provision of patient care or other educational opportunities. More specifically, formative evaluations help:
> - residents identify their strengths and weaknesses and target areas that need work

- **program directors and faculty members recognize where residents are struggling and address problems immediately**

**Summative evaluation is *evaluating a resident's learning* by comparing the residents against the goals and objectives of the rotation and program, respectively. Summative evaluation is utilized to make decisions about promotion to the next level of training, or program completion.**

**End-of-rotation and end-of-year evaluations have both summative and formative components. Information from a summative evaluation can be used formatively when residents or faculty members use it to guide their efforts and activities in subsequent rotations and to successfully complete the residency program.**

**Feedback, formative evaluation, and summative evaluation compare intentions with accomplishments, enabling the transformation of a neophyte physician to one with growing expertise.**

**V.A.1.a)**    **Faculty members must directly observe, evaluate, and frequently provide feedback on resident performance during each rotation or similar educational assignment. (Core)**

**Background and Intent: Faculty members should provide feedback frequently throughout the course of each rotation. Residents require feedback from faculty members to reinforce well-performed duties and tasks, as well as to correct deficiencies. This feedback will allow for the development of the learner as they strive to achieve the Milestones. More frequent feedback is strongly encouraged for residents who have deficiencies that may result in a poor final rotation evaluation.**

**V.A.1.b)**    **Evaluation must be documented at the completion of the assignment. (Core)**

**V.A.1.b).(1)**    **For block rotations of greater than three months in duration, evaluation must be documented at least every three months. (Core)**

**V.A.1.b).(2)**    **Longitudinal experiences, such as continuity clinic in the context of other clinical responsibilities, must be evaluated at least every three months and at completion. (Core)**

**V.A.1.c)**    **The program must provide an objective performance evaluation based on the Competencies and the specialty-specific Milestones, and must: (Core)**

**V.A.1.c).(1)**    **use multiple evaluators (e.g., faculty members, peers, patients, self, and other professional staff members); and, (Core)**

**V.A.1.c).(2)**    **provide that information to the Clinical Competency Committee for its synthesis of progressive resident**

performance and improvement toward unsupervised practice. (Core)

V.A.1.d)    The program director or their designee, with input from the Clinical Competency Committee, must:

V.A.1.d).(1)    meet with and review with each resident their documented semi-annual evaluation of performance, including progress along the specialty-specific Milestones; (Core)

V.A.1.d).(2)    assist residents in developing individualized learning plans to capitalize on their strengths and identify areas for growth; and, (Core)

V.A.1.d).(3)    develop plans for residents failing to progress, following institutional policies and procedures. (Core)

---

Background and Intent: Learning is an active process that requires effort from the teacher and the learner. Faculty members evaluate a resident's performance at least at the end of each rotation. The program director or their designee will review those evaluations, including their progress on the Milestones, at a minimum of every six months. Residents should be encouraged to reflect upon the evaluation, using the information to reinforce well-performed tasks or knowledge or to modify deficiencies in knowledge or practice. Working together with the faculty members, residents should develop an individualized learning plan.

Residents who are experiencing difficulties with achieving progress along the Milestones may require intervention to address specific deficiencies. Such intervention, documented in an individual remediation plan developed by the program director or a faculty mentor and the resident, will take a variety of forms based on the specific learning needs of the resident. However, the ACGME recognizes that there are situations which require more significant intervention that may alter the time course of resident progression. To ensure due process, it is essential that the program director follow institutional policies and procedures.

---

V.A.1.e)    At least annually, there must be a summative evaluation of each resident that includes their readiness to progress to the next year of the program, if applicable. (Core)

V.A.1.f)    The evaluations of a resident's performance must be accessible for review by the resident. (Core)

[The Review Committee may further specify under any requirement in V.A.1.-V.A.1.f)]

V.A.2.    Final Evaluation

V.A.2.a)    The program director must provide a final evaluation for each resident upon completion of the program. (Core)

**V.A.2.a).(1)**      **The specialty-specific Milestones, and when applicable the specialty-specific Case Logs, must be used as tools to ensure residents are able to engage in autonomous practice upon completion of the program.** **(Core)**

**V.A.2.a).(2)**      **The final evaluation must:**

**V.A.2.a).(2).(a)**      **become part of the resident's permanent record maintained by the institution, and must be accessible for review by the resident in accordance with institutional policy;** **(Core)**

**V.A.2.a).(2).(b)**      **verify that the resident has demonstrated the knowledge, skills, and behaviors necessary to enter autonomous practice; and,** **(Core)**

**V.A.2.a).(2).(c)**      **be shared with the resident upon completion of the program.** **(Core)**

**V.A.3.**      **A Clinical Competency Committee must be appointed by the program director.** **(Core)**

**V.A.3.a)**      **At a minimum, the Clinical Competency Committee must include three members of the program faculty, at least one of whom is a core faculty member.** **(Core)**

**V.A.3.a).(1)**      **Additional members must be faculty members from the same program or other programs, or other health professionals who have extensive contact and experience with the program's residents.** **(Core)**

> **Background and Intent: The requirements regarding the Clinical Competency Committee do not preclude or limit a program director's participation on the Clinical Competency Committee. The intent is to leave flexibility for each program to decide the best structure for its own circumstances, but a program should consider: its program director's other roles as resident advocate, advisor, and confidante; the impact of the program director's presence on the other Clinical Competency Committee members' discussions and decisions; the size of the program faculty; and other program-relevant factors. Inclusivity is an important consideration in the appointment of Clinical Competency Committee members, allowing for diverse participation to ensure fair evaluation. The program director has final responsibility for resident evaluation and promotion decisions.**
>
> **Program faculty may include more than the physician faculty members, such as other physicians and non-physicians who teach and evaluate the program's residents. There may be additional members of the Clinical Competency Committee. Chief residents who have completed core residency programs in their specialty may be members of the Clinical Competency Committee.**

**V.A.3.b)**      **The Clinical Competency Committee must:**

**V.A.3.b).(1)**     review all resident evaluations at least semi-annually; (Core)

**V.A.3.b).(2)**     determine each resident's progress on achievement of the specialty-specific Milestones; and, (Core)

**V.A.3.b).(3)**     meet prior to the residents' semi-annual evaluations and advise the program director regarding each resident's progress. (Core)

**V.B.**     **Faculty Evaluation**

**V.B.1.**     The program must have a process to evaluate each faculty member's performance as it relates to the educational program at least annually. (Core)

---

Background and Intent: The program director is responsible for the educational program and all educators. While the term "faculty" may be applied to physicians within a given institution for other reasons, it is applied to residency program faculty members only through approval by a program director. The development of the faculty improves the education, clinical, and research aspects of a program. Faculty members have a strong commitment to the resident and desire to provide optimal education and work opportunities. Faculty members must be provided feedback on their contribution to the mission of the program. All faculty members who interact with residents desire feedback on their education, clinical care, and research. If a faculty member does not interact with residents, feedback is not required. With regard to the diverse operating environments and configurations, the residency program director may need to work with others to determine the effectiveness of the program's faculty performance with regard to their role in the educational program. All teaching faculty members should have their educational efforts evaluated by the residents in a confidential and anonymous manner. Other aspects for the feedback may include research or clinical productivity, review of patient outcomes, or peer review of scholarly activity. The process should reflect the local environment and identify the necessary information. The feedback from the various sources should be summarized and provided to the faculty on an annual basis by a member of the leadership team of the program.

---

**V.B.1.a)**     This evaluation must include a review of the faculty member's clinical teaching abilities, engagement with the educational program, participation in faculty development related to their skills as an educator, clinical performance, professionalism, and scholarly activities. (Core)

**V.B.1.b)**     This evaluation must include written, anonymous, and confidential evaluations by the residents. (Core)

**V.B.2.**     Faculty members must receive feedback on their evaluations at least annually. (Core)

**V.B.3.**     Results of the faculty educational evaluations should be incorporated into program-wide faculty development plans. (Core)

> **Background and Intent:** The quality of the faculty's teaching and clinical care is a determinant of the quality of the program and the quality of the residents' future clinical care. Therefore, the program has the responsibility to evaluate and improve the program faculty members' teaching, scholarship, professionalism, and quality care. This section mandates annual review of the program's faculty members for this purpose, and can be used as input into the Annual Program Evaluation.

**V.C.**      **Program Evaluation and Improvement**

**V.C.1.**      The program director must appoint the Program Evaluation Committee to conduct and document the Annual Program Evaluation as part of the program's continuous improvement process. (Core)

**V.C.1.a)**      The Program Evaluation Committee must be composed of at least two program faculty members, at least one of whom is a core faculty member, and at least one resident. (Core)

**V.C.1.b)**      Program Evaluation Committee responsibilities must include:

**V.C.1.b).(1)**      review of the program's self-determined goals and progress toward meeting them; (Core)

**V.C.1.b).(2)**      guiding ongoing program improvement, including development of new goals, based upon outcomes; and, (Core)

**V.C.1.b).(3)**      review of the current operating environment to identify strengths, challenges, opportunities, and threats as related to the program's mission and aims. (Core)

> **Background and Intent:** To achieve its mission and educate and train quality physicians, a program must evaluate its performance and plan for improvement in the Annual Program Evaluation. Performance of residents and faculty members is a reflection of program quality, and can use metrics that reflect the goals that a program has set for itself. The Program Evaluation Committee utilizes outcome parameters and other data to assess the program's progress toward achievement of its goals and aims. The Program Evaluation Committee advises the program director through program oversight.

**V.C.1.c)**      The Program Evaluation Committee should consider the outcomes from prior Annual Program Evaluation(s), aggregate resident and faculty written evaluations of the program, and other relevant data in its assessment of the program. (Core)

> **Background and Intent:** Other data to be considered for assessment include:
> - **Curriculum**

- **ACGME letters of notification, including citations, Areas for Improvement, and comments**
- **Quality and safety of patient care**
- **Aggregate resident and faculty well-being; recruitment and retention; workforce diversity, including graduate medical education staff and other relevant academic community members; engagement in quality improvement and patient safety; and scholarly activity**
- **ACGME Resident and Faculty Survey results**
- **Aggregate resident Milestones evaluations, and achievement on in-training examinations (where applicable), board pass and certification rates, and graduate performance.**
- **Aggregate faculty evaluation and professional development**

**V.C.1.d)**  **The Program Evaluation Committee must evaluate the program's mission and aims, strengths, areas for improvement, and threats.** (Core)

**V.C.1.e)**  **The Annual Program Evaluation, including the action plan, must be distributed to and discussed with the residents and the members of the teaching faculty, and be submitted to the DIO.** (Core)

**V.C.2.**  **The program must complete a Self-Study and submit it to the DIO.** (Core)

**Background and Intent: Outcomes of the documented Annual Program Evaluation can be integrated into the Accreditation Self-Study process. The Self-Study is an objective, comprehensive evaluation of the residency program, with the aim of improving it. Underlying the Accreditation Self-Study is this longitudinal evaluation of the program and its learning environment, facilitated through sequential Annual Program Evaluations that focus on the required components, with an emphasis on program strengths and self-identified areas for improvement. Details regarding the timing and expectations for the Accreditation Self-Study are provided in the *ACGME Manual of Policies and Procedures*. Additionally, a description of the [Self-Study process] is available on the ACGME website.**

*V.C.3.*  *One goal of ACGME-accredited education is to educate physicians who seek and achieve board certification. One measure of the effectiveness of the educational program is the ultimate pass rate.*

*The program director should encourage all eligible program graduates to take the certifying examination offered by the applicable American Board of Medical Specialties (ABMS) member board or American Osteopathic Association (AOA) certifying board. [If certification in the specialty is not offered by the ABMS and/or the AOA, V.C.3.a)-V.C.3.f) will be omitted.]*

*V.C.3.a)*  *For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual written exam, in the preceding three years, the program's aggregate pass rate of*

those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty. (Outcome)

V.C.3.b)      For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial written exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty. (Outcome)

V.C.3.c)      For specialties in which the ABMS member board and/or AOA certifying board offer(s) an annual oral exam, in the preceding three years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty. (Outcome)

V.C.3.d)      For specialties in which the ABMS member board and/or AOA certifying board offer(s) a biennial oral exam, in the preceding six years, the program's aggregate pass rate of those taking the examination for the first time must be higher than the bottom fifth percentile of programs in that specialty. (Outcome)

V.C.3.e)      For each of the exams referenced in V.C.3.a)-d), any program whose graduates over the time period specified in the requirement have achieved an 80 percent pass rate will have met this requirement, no matter the percentile rank of the program for pass rate in that specialty. (Outcome)

---

Background and Intent: Setting a single standard for pass rate that works across specialties is not supportable based on the heterogeneity of the psychometrics of different examinations. By using a percentile rank, the performance of the lower five percent (fifth percentile) of programs can be identified and set on a path to curricular and test preparation reform.

There are specialties where there is a very high board pass rate that could leave successful programs in the bottom five percent (fifth percentile) despite admirable performance. These high-performing programs should not be cited, and V.C.3.e) is designed to address this.

---

V.C.3.f)      Programs must report, in ADS, board certification status annually for the cohort of board-eligible residents that graduated seven years earlier. (Core)

---

Background and Intent: It is essential that residency programs demonstrate knowledge and skill transfer to their residents. One measure of that is the qualifying or initial certification exam pass rate. Another important parameter of the success of the program is the ultimate board certification rate of its graduates. Graduates are eligible for up to seven years from residency graduation for initial certification. The ACGME

---

**will calculate a rolling three-year average of the ultimate board certification rate at seven years post-graduation, and the Review Committees will monitor it.**

**The Review Committees will track the rolling seven-year certification rate as an indicator of program quality. Programs are encouraged to monitor their graduates' performance on board certification examinations.**

**In the future, the ACGME may establish parameters related to ultimate board certification rates.**

VI.    **The Learning and Working Environment**

*Residency education must occur in the context of a learning and working environment that emphasizes the following principles:*

- *Excellence in the safety and quality of care rendered to patients by residents today*

- *Excellence in the safety and quality of care rendered to patients by today's residents in their future practice*

- *Excellence in professionalism*

- *Appreciation for the privilege of caring for patients*

- *Commitment to the well-being of the students, residents, faculty members, and all members of the health care team*

VI.A.       **Patient Safety, Quality Improvement, Supervision, and Accountability**

VI.A.1.          **Patient Safety and Quality Improvement**

VI.A.1.a)          **Patient Safety**

VI.A.1.a).(1)          **Culture of Safety**

*A culture of safety requires continuous identification of vulnerabilities and a willingness to transparently deal with them. An effective organization has formal mechanisms to assess the knowledge, skills, and attitudes of its personnel toward safety in order to identify areas for improvement.*

VI.A.1.a).(1).(a)          **The program, its faculty, residents, and fellows must actively participate in patient safety systems and contribute to a culture of safety. (Core)**

VI.A.1.a).(2)          **Patient Safety Events**

*Reporting, investigation, and follow-up of safety events, near misses, and unsafe conditions are pivotal mechanisms for improving patient safety, and are essential for the success of any patient safety program. Feedback and experiential learning are essential to developing true competence in the ability to identify causes and institute sustainable systems-based changes to ameliorate patient safety vulnerabilities.*

VI.A.1.a).(2).(a)    **Residents, fellows, faculty members, and other clinical staff members must:**

VI.A.1.a).(2).(a).(i)    **know their responsibilities in reporting patient safety eventsuand unsafe conditions at the clinical site, including how to report such events; and,** (Core)

VI.A.1.a).(2).(a).(ii)    **be provided with summary information of their institution's patient safety reports.** (Core)

VI.A.1.a).(2).(b)    **Residents must participate as team members in real and/or simulated interprofessional clinical patient safety and quality improvement activities, such as root cause analyses or other activities that include analysis, as well as formulation and implementation of actions.** (Core)

VI.A.1.a).(3)    **Quality Metrics**

*Access to data is essential to prioritizing activities for care improvement and evaluating success of improvement efforts.*

VI.A.1.a).(3).(a)    **Residents and faculty members must receive data on quality metrics and benchmarks related to their patient populations.** (Core)
**[The Review Committee may further specify]**

VI.A.2.    **Supervision and Accountability**

VI.A.2.a)    *Although the attending physician is ultimately responsible for the care of the patient, every physician shares in the responsibility and accountability for their efforts in the provision of care. Effective programs, in partnership with their Sponsoring Institutions, define, widely communicate, and monitor a structured chain of responsibility and accountability as it relates to the supervision of all patient care.*

*Supervision in the setting of graduate medical education provides safe and effective care to patients; ensures each resident's development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishes a foundation for continued professional growth.*

VI.A.2.a).(1)    **Residents and faculty members must inform each patient of their respective roles in that patient's care when providing direct patient care. (Core)**

VI.A.2.a).(1).(a)    **This information must be available to residents, faculty members, other members of the health care team, and patients. (Core)**

> **Background and Intent: Each patient will have an identifiable and appropriately credentialed and privileged attending physician (or licensed independent practitioner as specified by the applicable Review Committee) who is responsible and accountable for the patient's care.**

VI.A.2.a).(2)    **The program must demonstrate that the appropriate level of supervision in place for all residents is based on each resident's level of training and ability, as well as patient complexity and acuity. Supervision may be exercised through a variety of methods, as appropriate to the situation. (Core)**
**[The Review Committee may specify which activities require different levels of supervision.]**

> **Background and Intent: Appropriate supervision is essential for patient safety and high-quality teaching. Supervision is also contextual. There is tremendous diversity of resident-patient interactions, training locations, and resident skills and abilities, even at the same level of the educational program. The degree of supervision for a resident is expected to evolve progressively as the resident gains more experience, even with the same patient condition or procedure. The level of supervision for each resident is commensurate with that resident's level of independence in practice; this level of supervision may be enhanced based on factors such as patient safety, complexity, acuity, urgency, risk of serious safety events, or other pertinent variables.**

VI.A.2.b)    **Levels of Supervision**

**To promote appropriate resident supervision while providing for graded authority and responsibility, the program must use the following classification of supervision:**

VI.A.2.b).(1)    **Direct Supervision:**

VI.A.2.b).(1).(a)    **the supervising physician is physically present with the resident during the key portions of the patient interaction; or,**
**[The Review Committee may further specify]**

| | |
|---|---|
| **VI.A.2.b).(1).(a).(i)** | **PGY-1 residents must initially be supervised directly, only as described in VI.A.2.c).(1).(a).** (Core)<br>**[The Review Committee may describe the conditions under which PGY-1 residents progress to be supervised indirectly]** |
| **VI.A.2.b).(1).(b)** | **the supervising physician and/or patient is not physically present with the resident and the supervising physician is concurrently monitoring the patient care through appropriate telecommunication technology.**<br>**[The RC may choose not to permit this requirement. The Review Committee may further specify]** |
| **VI.A.2.b).(2)** | **Indirect Supervision: the supervising physician is not providing physical or concurrent visual or audio supervision but is immediately available to the resident for guidance and is available to provide appropriate direct supervision.** |
| **VI.A.2.b).(3)** | **Oversight – the supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.** |
| **VI.A.2.c)** | **The program must define when physical presence of a supervising physician is required.** (Core) |
| **VI.A.2.d)** | **The privilege of progressive authority and responsibility, conditional independence, and a supervisory role in patient care delegated to each resident must be assigned by the program director and faculty members.** (Core) |
| **VI.A.2.d).(1)** | **The program director must evaluate each resident's abilities based on specific criteria, guided by the Milestones.** (Core) |
| **VI.A.2.d).(2)** | **Faculty members functioning as supervising physicians must delegate portions of care to residents based on the needs of the patient and the skills of each resident.** (Core) |
| **VI.A.2.d).(3)** | **Senior residents or fellows should serve in a supervisory role to junior residents in recognition of their progress toward independence, based on the needs of each patient and the skills of the individual resident or fellow.** (Detail) |

**VI.A.2.e)**                    Programs must set guidelines for circumstances and events in which residents must communicate with the supervising faculty member(s). (Core)

**VI.A.2.e).(1)**                    Each resident must know the limits of their scope of authority, and the circumstances under which the resident is permitted to act with conditional independence. (Outcome)

Background and Intent: The ACGME Glossary of Terms defines conditional independence as: Graded, progressive responsibility for patient care with defined oversight.

**VI.A.2.f)**                    Faculty supervision assignments must be of sufficient duration to assess the knowledge and skills of each resident and to delegate to the resident the appropriate level of patient care authority and responsibility. (Core)

**VI.B.**        Professionalism

**VI.B.1.**                    Programs, in partnership with their Sponsoring Institutions, must educate residents and faculty members concerning the professional and ethical responsibilities of physicians, including but not limited to their obligation to be appropriately rested and fit to provide the care required by their patients. (Core)

Background and Intent: This requirement emphasizes the professional responsibility of residents and faculty members to arrive for work adequately rested and ready to care for patients. It is also the responsibility of residents, faculty members, and other members of the care team to be observant, to intervene, and/or to escalate their concern about resident and faculty member fitness for work, depending on the situation, and in accordance with institutional policies. This includes recognition of impairment, including from illness, fatigue, and substance use, in themselves, their peers, and other members of the health care team, and the recognition that under certain circumstances, the best interests of the patient may be served by transitioning that patient's care to another qualified and rested practitioner.

**VI.B.2.**                    The learning objectives of the program must:

**VI.B.2.a)**                    be accomplished without excessive reliance on residents to fulfill non-physician obligations; (Core)

Background and Intent: Routine reliance on residents to fulfill non-physician obligations increases work compression for residents and does not provide an optimal educational experience. Non-physician obligations are those duties which in most institutions are performed by nursing and allied health professionals, transport services, or clerical staff. Examples of such obligations include transport of patients from the wards or units for procedures elsewhere in the hospital; routine blood drawing for laboratory tests; routine monitoring of patients when off the ward; and clerical duties, such as

scheduling. While it is understood that residents may be expected to do any of these things on occasion when the need arises, these activities should not be performed by residents routinely and must be kept to a minimum to optimize resident education.

VI.B.2.b)                    ensure manageable patient care responsibilities; and, (Core)
                             [The Review Committee may further specify]

Background and Intent: The Common Program Requirements do not define "manageable patient care responsibilities" as this is variable by specialty and PGY level. Review Committees will provide further detail regarding patient care responsibilities in the applicable specialty-specific Program Requirements and accompanying FAQs. However, all programs, regardless of specialty, should carefully assess how the assignment of patient care responsibilities can affect work compression, especially at the PGY-1 level.

VI.B.2.c)                    include efforts to enhance the meaning that each resident finds in the experience of being a physician, including protecting time with patients, providing administrative support, promoting progressive independence and flexibility, and enhancing professional relationships. (Core)

VI.B.3.                      The program director, in partnership with the Sponsoring Institution, must provide a culture of professionalism that supports patient safety and personal responsibility. (Core)

Background and Intent: The accurate reporting of clinical and educational work hours, patient outcomes, and clinical experience data are the responsibility of the program leadership, residents, and faculty.

VI.B.4.                      Residents and faculty members must demonstrate an understanding of their personal role in the safety and welfare of patients entrusted to their care, including the ability to report unsafe conditions and safety events. (Core)

VI.B.5.                      Programs, in partnership with their Sponsoring Institutions, must provide a professional, equitable, respectful, and civil environment that is psychologically safe and that is free from discrimination, sexual and other forms of harassment, mistreatment, abuse, or coercion of students, residents, faculty, and staff. (Core)

Background and Intent: Psychological safety is defined as an environment of trust and respect that allows individuals to feel able to ask for help, admit mistakes, raise concerns, suggest ideas, and challenge ways of working and the ideas of others on the team, including the ideas of those in authority, without fear of humiliation, and the knowledge that mistakes will be handled justly and fairly.

The ACGME is unable to adjudicate disputes between individuals, including residents, faculty members, and staff members. However, information that suggests a pattern of behavior that violates the requirement above will trigger a careful review and, if

deemed appropriate, action by the Review Committee and/or ACGME, in accordance with ACGME Policies and Procedures.

**VI.B.6.**  **Programs, in partnership with their Sponsoring Institutions, should have a process for education of residents and faculty regarding unprofessional behavior and a confidential process for reporting, investigating, and addressing such concerns.** (Core)

**VI.C.**  **Well-Being**

*Psychological, emotional, and physical well-being are critical in the development of the competent, caring, and resilient physician and require proactive attention to life inside and outside of medicine. Well-being requires that physicians retain the joy in medicine while managing their own real-life stresses. Self-care and responsibility to support other members of the health care team are important components of professionalism; they are also skills that must be modeled, learned, and nurtured in the context of other aspects of residency training.*

*Residents and faculty members are at risk for burnout and depression. Programs, in partnership with their Sponsoring Institutions, have the same responsibility to address well-being as other aspects of resident competence. Physicians and all members of the health care team share responsibility for the well-being of each other. A positive culture in a clinical learning environment models constructive behaviors, and prepares residents with the skills and attitudes needed to thrive throughout their careers.*

**VI.C.1.**  **The responsibility of the program, in partnership with the Sponsoring Institution, must include:**

**VI.C.1.a)**  **attention to scheduling, work intensity, and work compression that impacts resident well-being;** (Core)

**VI.C.1.b)**  **evaluating workplace safety data and addressing the safety of residents and faculty members;** (Core)

**Background and Intent:** This requirement emphasizes the responsibility shared by the Sponsoring Institution and its programs to gather information and utilize systems that monitor and enhance resident and faculty member safety, including physical safety. Issues to be addressed include, but are not limited to, monitoring of workplace injuries, physical or emotional violence, vehicle collisions, and emotional well-being after safety events.

**VI.C.1.c)**  **policies and programs that encourage optimal resident and faculty member well-being; and,** (Core)

**Background and Intent:** Well-being includes having time away from work to engage with family and friends, as well as to attend to personal needs and to one's own health,

including adequate rest, healthy diet, and regular exercise. The intent of this requirement is to ensure that residents have the opportunity to access medical and dental care, including mental health care, at times that are appropriate to their individual circumstances. Residents must be provided with time away from the program as needed to access care, including appointments scheduled during their working hours.

**VI.C.1.c).(1)**    **Residents must be given the opportunity to attend medical, mental health, and dental care appointments, including those scheduled during their working hours.** (Core)

**VI.C.1.d)**    education of residents and faculty members in:

**VI.C.1.d).(1)**    identification of the symptoms of burnout, depression, and substance use disorders, suicidal ideation, or potential for violence, including means to assist those who experience these conditions; (Core)

**VI.C.1.d).(2)**    recognition of these symptoms in themselves and how to seek appropriate care; and, (Core)

**VI.C.1.d).(3)**    access to appropriate tools for self-screening. (Core)

Background and Intent: Programs and Sponsoring Institutions are encouraged to review materials to create systems for identification of burnout, depression, and substance use disorders. Materials and more information are available in Learn at ACGME (**https://dl.acgme.org/pages/well-being-tools-resources**).

Individuals experiencing burnout, depression, a substance use disorder, and/or suicidal ideation are often reluctant to reach out for help due to the stigma associated with these conditions and may be concerned that seeking help may have a negative impact on their career. Recognizing that physicians are at increased risk in these areas, it is essential that residents and faculty members are able to report their concerns when another resident or faculty member displays signs of any of these conditions, so that the program director or other designated personnel, such as the department chair, may assess the situation and intervene as necessary to facilitate access to appropriate care. Residents and faculty members must know which personnel, in addition to the program director, have been designated with this responsibility; those personnel and the program director should be familiar with the institution's impaired physician policy and any employee health, employee assistance, and/or wellness/well-being programs within the institution. In cases of physician impairment, the program director or designated personnel should follow the policies of their institution for reporting.

**VI.C.1.e)**    providing access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week. (Core)

> **Background and Intent: The intent of this requirement is to ensure that residents have immediate access at all times to a mental health professional (psychiatrist, psychologist, Licensed Clinical Social Worker, Primary Mental Health Nurse Practitioner, or Licensed Professional Counselor) for urgent or emergent mental health issues. In-person, telemedicine, or telephonic means may be utilized to satisfy this requirement. Care in the Emergency Department may be necessary in some cases, but not as the primary or sole means to meet the requirement.**
>
> **The reference to affordable counseling is intended to require that financial cost not be a barrier to obtaining care.**

VI.C.2.    **There are circumstances in which residents may be unable to attend work, including but not limited to fatigue, illness, family emergencies, and medical, parental, or caregiver leave. Each program must allow an appropriate length of absence for residents unable to perform their patient care responsibilities.** (Core)

VI.C.2.a)    **The program must have policies and procedures in place to ensure coverage of patient care and ensure continuity of patient care.** (Core)

VI.C.2.b)    **These policies must be implemented without fear of negative consequences for the resident who is or was unable to provide the clinical work.** (Core)

> **Background and Intent: Residents may need to extend their length of training depending on length of absence and specialty board eligibility requirements. Teammates should assist colleagues in need and equitably reintegrate them upon return.**

VI.D.    **Fatigue Mitigation**

VI.D.1.    **Programs must educate all residents and faculty members in recognition of the signs of fatigue and sleep deprivation, alertness management, and fatigue mitigation processes.** (Detail)

> **Background and Intent: Providing medical care to patients is physically and mentally demanding. Night shifts, even for those who have had enough rest, cause fatigue. Experiencing fatigue in a supervised environment during training prepares residents for managing fatigue in practice. It is expected that programs adopt fatigue mitigation processes and ensure that there are no negative consequences and/or stigma for using fatigue mitigation strategies.**
>
> **Strategies that may be used include but are not limited to strategic napping; the judicious use of caffeine; availability of other caregivers; time management to maximize sleep off-duty; learning to recognize the signs of fatigue, and self-monitoring performance and/or asking others to monitor performance; remaining active to promote alertness; maintaining a healthy diet; using relaxation techniques to fall asleep; maintaining a consistent sleep routine; exercising regularly; increasing sleep time before and after call; and ensuring sufficient sleep recovery periods.**

**VI.D.2.**      **The program, in partnership with its Sponsoring Institution, must ensure adequate sleep facilities and safe transportation options for residents who may be too fatigued to safely return home. (Core)**

**VI.E.**      **Clinical Responsibilities, Teamwork, and Transitions of Care**

**VI.E.1.**      **Clinical Responsibilities**

**The clinical responsibilities for each resident must be based on PGY level, patient safety, resident ability, severity and complexity of patient illness/condition, and available support services. (Core) [Optimal clinical workload may be further specified by each Review Committee]**

**Background and Intent: The changing clinical care environment of medicine has meant that work compression due to high complexity has increased stress on residents. Faculty members and program directors need to make sure residents function in an environment that has safe patient care and a sense of resident well-being. It is an essential responsibility of the program director to monitor resident workload. Workload should be distributed among the resident team and interdisciplinary teams to minimize work compression.**

**VI.E.2.**      **Teamwork**

**Residents must care for patients in an environment that maximizes communication and promotes safe, interprofessional, team-based care in the specialty and larger health system. (Core) [The Review Committee may further specify]**

**Background and Intent: Effective programs will have a structure that promotes safe, interprofessional, team-based care. Optimal patient safety occurs in the setting of a coordinated interprofessional learning and working environment.**

**VI.E.3.**      **Transitions of Care**

**VI.E.3.a)**      **Programs must design clinical assignments to optimize transitions in patient care, including their safety, frequency, and structure. (Core)**

**VI.E.3.b)**      **Programs, in partnership with their Sponsoring Institutions, must ensure and monitor effective, structured hand-off processes to facilitate both continuity of care and patient safety. (Core)**

**VI.E.3.c)**      **Programs must ensure that residents are competent in communicating with team members in the hand-off process. (Outcome)**

**VI.F.**      **Clinical Experience and Education**

*Programs, in partnership with their Sponsoring Institutions, must design an effective program structure that is configured to provide residents with educational and clinical experience opportunities, as well as reasonable opportunities for rest and personal activities.*

> **Background and Intent: The terms "clinical experience and education," "clinical and educational work," and "clinical and educational work hours" replace the terms "duty hours," "duty periods," and "duty." These terms are used in response to concerns that the previous use of the term "duty" in reference to number of hours worked may have led some to conclude that residents' duty to "clock out" on time superseded their duty to their patients.**

VI.F.1.    Maximum Hours of Clinical and Educational Work per Week

**Clinical and educational work hours must be limited to no more than 80 hours per week, averaged over a four-week period, inclusive of all in-house clinical and educational activities, clinical work done from home, and all moonlighting.** [Core]

> **Background and Intent: Programs and residents have a shared responsibility to ensure that the 80-hour maximum weekly limit is not exceeded. While the requirement has been written with the intent of allowing residents to remain beyond their scheduled work periods to care for a patient or participate in an educational activity, these additional hours must be accounted for in the allocated 80 hours when averaged over four weeks.**
>
> ***Work from Home***
> **While the requirement specifies that clinical work done from home must be counted toward the 80-hour maximum weekly limit, the expectation remains that scheduling be structured so that residents are able to complete most work on site during scheduled clinical work hours without requiring them to take work home. The requirements acknowledge the changing landscape of medicine, including electronic health records, and the resulting increase in the amount of work residents choose to do from home. The requirement provides flexibility for residents to do this while ensuring that the time spent by residents completing clinical work from home is accomplished within the 80-hour weekly maximum. Types of work from home that must be counted include using an electronic health record and taking calls from home. Reading done in preparation for the following day's cases, studying, and research done from home do not count toward the 80 hours. Resident decisions to leave the hospital before their clinical work has been completed and to finish that work later from home should be made in consultation with the resident's supervisor. In such circumstances, residents should be mindful of their professional responsibility to complete work in a timely manner and to maintain patient confidentiality.**
>
> **Residents are to track the time they spend on clinical work from home and to report that time to the program. Decisions regarding whether to report infrequent phone calls of very short duration will be left to the individual resident. Programs will need to factor in time residents are spending on clinical work at home when schedules are developed to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks. There is no requirement that programs assume responsibility for**

documenting this time. Rather, the program's responsibility is ensuring that residents report their time from home and that schedules are structured to ensure that residents are not working in excess of 80 hours per week, averaged over four weeks.

**VI.F.2.**            **Mandatory Time Free of Clinical Work and Education**

**VI.F.2.a)**                    Residents should have eight hours off between scheduled clinical work and education periods. (Detail)

Background and Intent: There may be circumstances when residents choose to stay to care for their patients or return to the hospital with fewer than eight hours free of clinical experience and education. This occurs within the context of the 80-hour and the one-day-off-in-seven requirements. While it is expected that resident schedules will be structured to ensure that residents are provided with a minimum of eight hours off between scheduled work periods, it is recognized that residents may choose to remain beyond their scheduled time, or return to the clinical site during this time-off period, to care for a patient. The requirement preserves the flexibility for residents to make those choices. It is also noted that the 80-hour weekly limit (averaged over four weeks) is a deterrent for scheduling fewer than eight hours off between clinical and education work periods, as it would be difficult for a program to design a schedule that provides fewer than eight hours off without violating the 80-hour rule.

**VI.F.2.b)**                    Residents must have at least 14 hours free of clinical work and education after 24 hours of in-house call. (Core)

Background and Intent: Residents have a responsibility to return to work rested, and thus are expected to use this time away from work to get adequate rest. In support of this goal, residents are encouraged to prioritize sleep over other discretionary activities.

**VI.F.2.c)**                    Residents must be scheduled for a minimum of one day in seven free of clinical work and required education (when averaged over four weeks). At-home call cannot be assigned on these free days. (Core)

Background and Intent: The requirement provides flexibility for programs to distribute days off in a manner that meets program and resident needs. It is strongly recommended that residents' preference regarding how their days off are distributed be considered as schedules are developed. It is desirable that days off be distributed throughout the month, but some residents may prefer to group their days off to have a "golden weekend," meaning a consecutive Saturday and Sunday free from work. The requirement for one free day in seven should not be interpreted as precluding a golden weekend. Where feasible, schedules may be designed to provide residents with a weekend, or two consecutive days, free of work. The applicable Review Committee will evaluate the number of consecutive days of work and determine whether they meet educational objectives. Programs are encouraged to distribute days off in a fashion that optimizes resident well-being, and educational and personal goals. It is noted that a day off is defined in the ACGME Glossary of Terms as "one (1) continuous 24-hour period free from all administrative, clinical, and educational activities."

VI.F.3.                    **Maximum Clinical Work and Education Period Length**

VI.F.3.a)                  **Clinical and educational work periods for residents must not exceed 24 hours of continuous scheduled clinical assignments.** (Core)

VI.F.3.a).(1)             **Up to four hours of additional time may be used for activities related to patient safety, such as providing effective transitions of care, and/or resident education. Additional patient care responsibilities must not be assigned to a resident during this time.** (Core)

**Background and Intent: The additional time referenced in VI.F.3.a).(1) should not be used for the care of new patients. It is essential that the resident continue to function as a member of the team in an environment where other members of the team can assess resident fatigue, and that supervision for post-call residents is provided. This 24 hours and up to an additional four hours must occur within the context of 80-hour weekly limit, averaged over four weeks.**

VI.F.4.                    **Clinical and Educational Work Hour Exceptions**

VI.F.4.a)                  **In rare circumstances, after handing off all other responsibilities, a resident, on their own initiative, may elect to remain or return to the clinical site in the following circumstances: to continue to provide care to a single severely ill or unstable patient; to give humanistic attention to the needs of a patient or patient's family; or to attend unique educational events.** (Detail)

VI.F.4.b)                  **These additional hours of care or education must be counted toward the 80-hour weekly limit.** (Detail)

**Background and Intent: This requirement is intended to provide residents with some control over their schedules by providing the flexibility to voluntarily remain beyond the scheduled responsibilities under the circumstances described above. It is important to note that a resident may remain to attend a conference, or return for a conference later in the day, only if the decision is made voluntarily. Residents must not be required to stay. Programs allowing residents to remain or return beyond the scheduled work and clinical education period must ensure that the decision to remain is initiated by the resident and that residents are not coerced. This additional time must be counted toward the 80-hour maximum weekly limit.**

VI.F.4.c)                  **A Review Committee may grant rotation-specific exceptions for up to 10 percent or a maximum of 88 clinical and educational work hours to individual programs based on a sound educational rationale.**

VI.F.4.c).(1)            **In preparing a request for an exception, the program director must follow the clinical and educational work**

hour exception policy from the *ACGME Manual of Policies and Procedures*. (Detail)

> **Background and Intent: Exceptions may be granted for specific rotations if the program can justify the increase based on criteria specified by the Review Committee. Review Committees may opt not to permit exceptions. The underlying philosophy for this requirement is that while it is expected that all residents should be able to train within an 80-hour work week, it is recognized that some programs may include rotations with alternate structures based on the nature of the specialty. DIO/GMEC approval is required before the request will be considered by the Review Committee.**

VI.F.5.          **Moonlighting**

VI.F.5.a)          **Moonlighting must not interfere with the ability of the resident to achieve the goals and objectives of the educational program, and must not interfere with the resident's fitness for work nor compromise patient safety.** (Core)

VI.F.5.b)          **Time spent by residents in internal and external moonlighting (as defined in the ACGME Glossary of Terms) must be counted toward the 80-hour maximum weekly limit.** (Core)

VI.F.5.c)          **PGY-1 residents are not permitted to moonlight.** (Core)

> **Background and Intent: For additional clarification of the expectations related to moonlighting, please refer to the Common Program Requirement FAQs (available at http://www.acgme.org/What-We-Do/Accreditation/Common-Program-Requirements).**

VI.F.6.          **In-House Night Float**

          **Night float must occur within the context of the 80-hour and one-day-off-in-seven requirements.** (Core)
          **[The maximum number of consecutive weeks of night float, and maximum number of months of night float per year may be further specified by the Review Committee.]**

VI.F.7.          **Maximum In-House On-Call Frequency**

          **Residents must be scheduled for in-house call no more frequently than every third night (when averaged over a four-week period).** (Core)

VI.F.8.          **At-Home Call**

VI.F.8.a)          **Time spent on patient care activities by residents on at-home call must count toward the 80-hour maximum weekly limit. The frequency of at-home call is not subject to the every-third-night limitation, but must satisfy the requirement for one day in seven free of clinical work and education, when averaged over four weeks.** (Core)

**VI.F.8.a).(1)**  **At-home call must not be so frequent or taxing as to preclude rest or reasonable personal time for each resident.** [(Core)]

**[The Review Committee may further specify under any requirement in VI.F.]**

---

**Background and Intent: As noted in VI.F.1., clinical work done from home when a resident is taking at-home call must count toward the 80-hour maximum weekly limit. This acknowledges the often significant amount of time residents devote to clinical activities when taking at-home call, and ensures that taking at-home call does not result in residents routinely working more than 80 hours per week. At-home call activities that must be counted include responding to phone calls and other forms of communication, as well as documentation, such as entering notes in an electronic health record. Activities such as reading about the next day's case, studying, or research activities do not count toward the 80-hour weekly limit.**

**In their evaluation of residency/fellowship programs, Review Committees will look at the overall impact of at-home call on resident/fellow rest and personal time.**

---

EXHIBIT C

  

RE: **Shelby Murphy, DO**                                                          **April 30th, 2024**

Colleagues –

I am writing in strong support of Dr. Shelby Murphy's appeal of her dismissal from the general surgery residency. In brief, this was an unjust dismissal.

I am not writing regarding her personal qualifications, medical knowledge, technical skill or from any direct experience with her clinically. She has not yet rotated on my service. I have had extensive interactions with her as an advisor - both formal and informal - to surgery residents. For context, I am also the previous program director of the Valleywise General Surgery residency, the former Valleywise Designated Institutional Official and the previous Alliance DIO/Assistant Dean for GME for Creighton University School of Medicine. I have almost 15 years of experience in GME administration including resident education, remediation, disciplinary action and termination. I feel uniquely qualified to speak as to the program and sponsoring institution's responsibility to trainees

From this perspective, I believe unequivocally that this termination is unjust. I believe the actions for which Dr. Murphy is being terminated are the direct result of the program's failure to execute its primary duty: to educate young physicians and train competent, capable surgeons.

It would be helpful to provide some background and context regarding Dr. Murphy's standing in the program as I believe this contributed to her decisions. Shelby had a rough start to the year on Burn - one of the tougher rotations in the program. She was harshly criticized by her senior resident for being inefficient and not just doing as she was told - that she questioned too much. I spoke with her many times during this period - tear-filled conversations of her being beaten down and told she needs to just follow orders. Her attempt to rescue her good name was to go to the other extreme - to never question her senior residents, just do as she was told and execute as quickly as possible. Her efficiency was emphasized more than accuracy and quality. She has worked hard to become a good "soldier" and just get things done as quickly as possible.

Previously, there was formal education provided to every surgical trainee regarding informed consent in the first months of their training - how to do it, what must be included, the legalities of the documented conversation versus the physical consent form and Arizona statutes regarding who can provide consent and who can obtain consent. This education was administered both as a lecture and as a skills lab session early in the academic year. It is not reasonable to assume that junior residents either just know how to obtain consent or that their senior residents are instructing them correctly. For something this important to patient care, the program has a responsibility to ensure this education is comprehensive.

To my knowledge, this education has been absent in the program curriculum since I left leadership in 2018. Six years later, informed consent education is something residents are just supposed to "pick

up" from other residents or attendings. However, if none of the residents in the program have every received any formal training regarding this process, how are we to ensure that Dr. Murphy was ever actually educated regarding informed consent?

I am not minimizing Dr. Murphy's actions. There is no doubt that signing someone else's name to anything is unethical and wrong. However, the value of our signature has been gradually lessened over time. Our current process at Valleywise only requires a signature on a computer signature pad - without anyone really know what or where they are signing.

There is also a culture in the program of one resident signing for another - one that the program is aware of however has not addressed outside of telling the residents they can be fired for doing it. Note that this communication from program leadership only occurred after Murphy's termination.

I spoke with no less than 5 residents - some of whom are highly regarded and hold leadership positions within the program - who all admitted privately (and only under the guarantee of anonymity out of fear for their own careers) that they have participated in this as well - signing someone else's name and/or having someone sign for them. This is apparently commonplace when it comes to phone consents - that the person signing as witness is often the person at the computer getting the consent while the actual witness sits nearby. While most residents stated they have not committed this action for in-person consents, it is not difficult to understand how the same "efficiency tool" could be applied to this process.

So now we have a PGY1 who is in the red when it comes to her reputation, trying to make up ground, immersed in an environment where signatures are meaningless and "everyone" signs for each other, having never actually received any formal instruction or education on informed consent and the legalities of a physician signature. She is told by her senior to just get the consent done after feeling completely disempowered to question anything. Of note, this same resident walked back his original story when he realized the severity of the situation. She is late for sign-out - something that can be costly when it comes to your "professionalism points." Are we really to expect she would not just get it done? How would we honestly expect her to do anything differently?

If we apply a "Just Culture" algorithm to this situation (attached), the right answer for Dr. Murphy is not termination. It is education and remediation.

I understand that there were additional factors cited in her termination - one of which was a "lack of remorse" when she was caught. She reportedly responded to the accusation by saying she only got in trouble because she got reported. But given the now uncovered culture of signing for others and the absence of education regarding surgical consent, it is understandable that she responded as she did and appeared to not understand the gravity of the situation.

I have also heard that a factor in the program's decision to terminate was that hospital leadership would no longer allow her in the clinical learning environment at Valleywise. I would ask how that position has anything to do with her employment by Creighton or her future in the program. Dr. Murphy has a training

license only - she is not a member of the credentialed medical staff. She is not yet licensed or credentialed to function independently. Even the ACGME requires that PGY1 residents be supervised directly (Surgery VI.A.2.b).(1).(a).(i). Both the program and the sponsoring institution have an obligation to advocate for all residents and fellows when it comes to their education.

It should be known to the Appeals Committee that this same thing happened in 2017. A preliminary surgical intern signed another resident's name on a surgical consent in an effort to get it done. He was also underperforming and admitted that he was scared to not finish his tasks. Rather than end his career, we applied the Just Culture Algorithm and determined that we were obligated to him to educate and remediate. He was placed on probation (reportable for the rest of his career) and a remediation plan designed to ensure we left him with all of the tools necessary to correct his actions. His remediation plan included writing a paper on the ethics of consent, presenting to the department the institutional policy and Arizona statutes on consent, attending Arizona Medical Board meetings to fully understand what happens to physicians whose integrity is compromised and I asked him to summarize American Board of Surgery, The American College of Surgeons, The American Board of Anesthesiology and the American Society of Anesthesiologist's statements on Ethics and their codes of conduct. That individual finished the year, went on to their anesthesia residency and has since graduated and successfully entered clinical practice. I believe as a program and sponsoring institution we fulfilled our obligation to educate and train.

In the case of Dr. Murphy, we have completely failed this trainee. The program absconded its responsibility to educate and teach this seemingly simple act, assuming that another resident - also not formally trained - would fulfill this duty. I also believe the sponsoring institution failed to advocate for a not yet fully developed physician's education and future. We are educators FIRST, evaluators second.

Dr. Murphy is just the canary in this coal mine, clearly indicating that there is a problem in the residency program. The issue at hand is a curriculum that does not cover the entire breadth of what is necessary for a resident to become a surgeon. And rather than address the curricular deficiency or help a struggling resident, she was terminated. Please know that this act alone will make it almost impossible for her to practice medicine. She is not eligible for an unrestricted license, nor will she be able to secure another position. This decision will essentially end her career in medicine before it has even begun.

I am not here to endorse her clinical skills, medical knowledge or future potential as a surgeon. But I believe strongly that she should have a chance to pursue a career in medicine. If reinstatement is not an option, at least allow her to resign so that she will have a chance of finding another position. If the Committee ultimately decides to uphold her termination, I expect the program and institution to deliver this level of discipline to all residents equally and prepare for additional terminations. Dr. Murphy is not the only trainee guilty of this infraction. She is simply the one who was reported, and one no one was invested in her enough to remediate. Terminating a resident in need of guidance, education and direction for a common action is not the act of an educator. We are better than this. We need to do better than this.

Cura personalis is having concern and care for the personal development of the whole person. If we are truly committed to the personal and professional development of the physicians and surgeons of

the future - our residents and fellows, then we are obligated to Dr. Murphy for the same. None of us are perfect. We are all life-long learners. Dr. Murphy deserves the opportunity to learn from this mistake and move forward in her career.

I am happy to speak with the committee, to answer any questions you may have or provide any additional information needed. Thank you for considering her appeal. And importantly, thank you for considering her potential and future.

**Elizabeth M.N. Ferguson, MD, FACS**
**Plastic and Reconstructive Surgery**
**Valleywise Health Medical Center**
2601 E. Roosevelt Street
Phoenix, AZ  85008
O: (602) 344-5611 | M: (602) 615-7205
elizabeth_ferguson@dmgaz.org | elizabethferguson@creighton.edu | efergu@midwestern.edu

**Assistant Professor | Creighton University School of Medicine**
**Clinical Assistant Professor | Arizona College of Osteopathic Medicine**
**Clinical Assistant Professor | University of Arizona College of Medicine – Phoenix**

# EXHIBIT D



# Creighton University School of Medicine-Phoenix Policies

POLICY:                          Supervision
GOVERNING BODY:        Graduate Medical Education Committee – Creighton University
                                      School of Medicine-Phoenix
GMEC APPROVAL DATE:   August 7, 2023; February 6, 2023
REVISED DATE:            February 6, 2023
ACGME ACCREDITATION STANDARD REFERENCE:
                                      Institutional Requirement:
                                      IV.J. Supervision

---

**PURPOSE**

Supervision in the setting of graduate medical education provides safe and effective care to patients; ensures each House Staff Physician's (HSP) development of the skills, knowledge, and attitudes required to enter the unsupervised practice of medicine; and establishes a foundation for continued professional growth.

**SCOPE**

The policy applies to all Creighton University School of Medicine - Phoenix (CUSOM-PHX) HSP and their respective training programs, that are Accreditation Council for Graduate Medical Education (ACGME) accredited or meet the criteria in the Non-ACGME Accredited Program Policy.

**DEFINITIONS**

- **Direct supervision**: Unless specified by a specific Review Committee, direct supervision means the supervising faculty is physically present during key portions of the patient interaction. Physically present is defined as the teaching physician is either located in the same room as the patient and/or performs a face-to-face service or it can be met through interactive video real-time communications technology that is synchronous when permitted by the appropriate Review Committee. Audio only technology does not meet this requirement.
- **Indirect supervision**: The supervising physician is not providing physical or concurrent visual supervision but is immediately available to the HSP for guidance and is available to provide appropriate direct supervision.
- **Oversight supervision**: The supervising physician is available to provide review of procedures/encounters with feedback provided after care is delivered.
- **Regulatory requirements**: Those dictated by a Graduate Medical Education (GME) accrediting body, the sponsoring institution or a governmental or other oversight body such as, but not limited to, Medicare or Joint Commission.
- **Supervising faculty**: An appropriately credentialed and qualified physician or licensed independent practitioner (as allowed by each accrediting body) appointed to the program faculty to provide HSP education and supervision and who has responsibility for the patient's care. Credentialing must be for independent performance. Faculty members who are under proctoring or other restrictions from the medical staff cannot perform as supervising faculty.

**POLICY**

GME is the crucial step of professional development between medical school and autonomous clinical practice. It is in this vital phase of the continuum of medical education that HSPs learn to provide



optimal patient care under the supervision of faculty members who not only instruct, but serve as role models of excellence, compassion, professionalism, and scholarship. The care of patients is undertaken with appropriate faculty supervision and conditional independence, allowing HSPs to attain the knowledge, skills, attitudes, and empathy required for autonomous practice. As HSP trainees acquire the knowledge and judgment that accrue with experience, they are allowed the privilege of increased responsibility for patient care as they progress to practice independently. Faculty members ensure that patients receive the level of care expected from a specialist in the field. They recognize and respond to the needs of the patients, HSPs, community, and institution.

The process of progressive responsibility is the underlying educational principle for all graduate medical and professional education, regardless of specialty or discipline. The responsibility of supervising faculty is to enhance the knowledge of HSPs while ensuring patient safety and quality care. Such responsibility is exercised by observation, consultation, and feedback, and includes the imparting of knowledge, skills, and attitudes/behaviors to the HSPs and the assurance that care is delivered in an appropriate, timely, and effective manner.

Supervision may be exercised through a variety of methods. For many aspects of patient care, the supervising physician may be a more advanced HSP. Other portions of care provided by the HSP can be adequately supervised by the appropriate availability of the supervising faculty member, fellow, or senior HSP, either on site or by means of telecommunication technology. Some activities require the physical presence of the supervising faculty member. In some circumstances, supervision may include post-hoc review of HSP-delivered care with feedback. If direct supervision is not required, the assigned supervising faculty must still be able to arrive at the health care site within a reasonable period when supervision needs are required because the patient care needs exceed the skill of the HSP. Each program is responsible for training their supervising faculty in their roles and responsibilities.

**RESPONSIBILITIES**
The provisions of this policy are applicable to any type of patient care activity provided by HSP.

1. Supervising faculty are ultimately responsible for the care provided to each patient and they must be familiar with each patient for whom they are responsible. Fulfillment of that responsibility requires personal involvement with each patient and each HSP who is participating in the care of that patient. Each patient must have a supervising faculty member whose name is identifiable in the patient record. Supervising faculty members should appropriately delegate portions of care to HSPs, based on the needs of the patient, the skills of the HSPs and other regulatory requirements. Other supervising faculty may at times be assigned responsibility for the care of the patient and the supervision of the HSPs involved. It is the responsibility of the supervising faculty member to be sure that the HSPs involved in the care of the patient are informed of such reassignment and can readily always access a supervising faculty member. Services that provide 24-hour, 7-days a week (24/7) HSP coverage, must provide call schedules to the training site administration. Call schedules must delineate both HSP and supervising faculty coverage.

2. Each training program is structured for HSPs to assume increasing levels of responsibility according to their experience, skill, knowledge, and judgment. The Clinical Competency Committee of each program defines the levels of responsibilities for each milestone of training and determines the clinical activities a HSP may perform under what level of supervision. The GME office ensures that this list of graduated levels of responsibility is available to the health care site in New Innovations. The CUSOM-PHX GME office in collaboration with the training



site(s) will ensure all who need access to this data housed in New Innovations will have access to it and can distribute it to other appropriate staff as needed.

3. To ensure patient safety and quality patient care while providing the opportunity for maximizing the educational experience of the HSP in the ambulatory setting, it is required that an appropriately qualified supervising faculty member is physically present for supervision during clinic hours. Tele-supervision is permitted only when allowed by the appropriate Review Committee.

4. In each training program, there will be circumstances in which all HSPs, regardless of level of training and experience, must verbally communicate with appropriate supervising faculty. Programs must identify and set guidelines for these circumstances and these guidelines must be available in writing for all HSPs. At a minimum, these circumstances will include:
   a. Emergency admission.
   b. Consultation for urgent condition.
   c. Transfer of patient to a higher level of care.
   d. Code Blue Team activation or equivalent activation, which could also include Rapid Response Team.
   e. Change in DNR status as defined by individual program policies.
   f. Patient or family dissatisfaction in accordance with hospital policy, but this policy does not supersede institutional requirements.
   g. Patient requesting discharge AMA; or
   h. Patient death.

5. Programs may set additional guidelines for circumstances and events in which HSPs must communicate with appropriate supervising faculty. Programs must provide a copy of their program supervision policy to the GME office.

6. Each HSP must know the limits of their scope of authority, and the circumstances under which HSP is permitted to act with conditional independence.

**MONITORING OF COMPLIANCE**

CUSOM-PHX must oversee supervision of HSP and have mechanisms by which HSP can report inadequate supervision and accountability in a protected manner that is free from reprisal.

The quality of HSP supervision and adherence to supervision guidelines and policies shall be monitored through annual review of the HSP's evaluation of their supervisors and rotations, and by the Graduate Medical Education Committee (GMEC). Any program that has a score of less than 90% on the ACGME question regarding appropriate level of supervision will need to submit an action plan to the GMEC, and the program director may be required to submit progress notes to the GMEC until the issue is resolved.

**AMENDMENTS OR TERMINATION OF THIS POLICY**

This policy supersedes all program level policies regarding this area/topic. In the event of any discrepancies between program policies and this GME policy, this GME institutional policy shall govern.

Creighton University reserves the right to modify, amend or terminate this policy at any time.